50 N.J. Super. 18 (1958)
141 A.2d 107
BOTANY MILLS, INC., PLAINTIFF-RESPONDENT,
v.
TEXTILE WORKERS UNION OF AMERICA, AFL-CIO AND FRANK CUCCIO, MANAGER OF PASSAIC JOINT BOARD OF TEXTILE WORKERS UNION OF AMERICA, AFL-CIO, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 20, 1958.
Decided April 28, 1958.
*23 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Sidney Reitman argued the cause for defendants-appellants (Messrs. Kapelsohn, Lerner, Leuchter & Reitman, attorneys).
Mr. Joseph Brandschain (of the Pennsylvania bar, admitted to argue the cause pro hac vice) argued the cause for plaintiff-respondent (Messrs. Bilder, Bilder & Freeman and Messrs. Wolf, Block, Schorr & Solis-Cohen, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
The defendant-union appeals from an order of the Chancery Division permanently restraining enforcement of an arbitration award and denying defendant's counterclaim for enforcement of the award. The plaintiff-company had sought this restraint after the arbitrator had entered an interim award favorable to the union's position that certain employees were entitled to vacation pay benefits under their collective bargaining agreement.
Botany Mills, the plaintiff, and the Textile Workers Union, the defendant, entered into a two-year collective bargaining agreement on April 14, 1954. The agreement, by Article XIX, was to continue in "full force and effect" until March 15, 1956 and for "successive one year periods" thereafter, *24 unless terminated by written notice given 60 days prior to the termination date.
At one time Botany employed over 6,000 employees, but by December 1955, because of intermittent layoffs due to technological changes and various work curtailments, this number had dwindled to about 1,000. Botany finally decided to discontinue operations and, on December 29, posted the following notice:

"NOTICE TO EMPLOYEES.
"The Dyeing and Finishing Operation of Botany Mills, Inc. will discontinue permanently as an active operation on December 31, 1955.
Since this operation is being discontinued, all salaried and hourly paid employees of the Dyeing and Finishing Division of Botany Mills, Inc. are hereby notified that they are laid off at the close of operations of their scheduled shifts on December 29th and December 30th, 1955."
On December 31 all manufacturing operations were discontinued.
The relevant contract provision concerning vacation pay, Article VI, entitled "Vacation and Vacation Pay," provides:
"Each employee in the employ of the Employer on each April 15th hereafter during the life of this agreement who has been in its employ at least one (1) year prior thereto but less than three (3) years, shall hereafter receive a vacation of one (1) week with Pay as hereinafter set forth at a time to be set by the Employer; each employee in the employ of the Employer on each April 15th hereafter during the life of this agreement who has been in its employ at least three (3) years prior thereto but less than five (5) years, shall hereafter receive a vacation of one (1) week with pay as hereinafter set forth at a time to be set by the Employer; and each employee in the employ of the Employer on each April 15th hereafter who has been in its employ for five (5) years or more prior thereto, shall receive a vacation of two (2) weeks with pay as hereinafter set forth."
The succeeding paragraphs of Article VI provide that in calculating the amount of vacation pay, for both hourly and piecework employees, the four-week period immediately preceding April 1 of the vacation year should be used as a base. *25 Vacations were to be scheduled between April 15 and September 15. It was further provided that:
"Any employee who is qualified for a vacation or vacation pay under the foregoing but who had been laid-off for a continuous period of six (a) months or more prior to April 15th * * * shall not be entitled to a vacation or vacation pay.
Any employee whose employment has been terminated prior to April 15th, as provided in Article XI-E shall not be entitled to a vacation or vacation pay."
Article I-K lists several reasons for which "seniority and continuous employment records" of employees would be lost, including layoffs for two years or more.
On January 9, 1956 the company gave notice pursuant to the aforementioned Article XIX of the contract that the collective agreement would be terminated effective March 15, 1956.
The union demanded vacation pay for all employees whose layoffs occurred after October 18, 1955. That date was specified by the union because of the contract provision concerning vacations quoted above, which excepts from disqualification from vacation benefits on account of layoff those employees who had been laid off less than six months prior to April 15 of the vacation year, and because the company had awarded vacation pay in 1954 and 1955 to any employee who had been laid off not earlier than the preceding October 15. The union had made these demands known to the company representatives as early as October 1955 at a meeting, engendered by rumors of the impending shut-down, between the union and Botany's general manager. The demands were formally renewed on February 2, 1956, before the expiration date of the contract. The company's answer to the counterclaim of the union in this cause admits it denied liability for the claims during the month of February 1956.
On April 4, 1956 the arbitration machinery of the contract was invoked by the union and the dispute was formally placed before the arbitrator.
*26 The arbitration clause of the agreement states that:
"Any differences or dispute between the parties whether or not a grievance, which is not satisfactorily adjusted under the preceding applicable provisions of this agreement, shall be promptly referred to arbitration, at the request of either party hereto. The arbitrator shall hear the matter expeditiously and render his decision which shall be final and conclusively binding upon the parties hereto.
The arbitrator shall have no jurisdiction or authority to add to, subtract from, modify or alter any of the terms of this agreement; nor shall the arbitrator have jurisdiction or authority to affect, rule upon, or grant any extension or renewal of this agreement."
The company challenged the jurisdiction of the arbitrator but participated in the proceedings with the understanding that it was not waiving its jurisdictional objection. The arbitrator, David I. Cole, heard the matter on June 14, 1956, and made an "Interim Award," holding that (1) he had jurisdiction to hear the cause, and (2) the employees laid off by the company on or about December 31, 1955 and subsequently were employees of the employer on April 16, 1956 and therefore entitled to vacations, and directing a further hearing of the dispute to determine the amount of vacation pay owed to individual employees.
One week later the company obtained an order to show cause from the Chancery Division seeking to enjoin the arbitration proceedings. On the return of the order, the court ruled that the arbitration proceedings should continue but that enforcement of any award be restrained until further order of the court.
On July 18, 1956 the arbitrator filed his final award and opinion, conforming to his interim award in all respects except that vacation pay was awarded to all employees laid off after October 15, 1955, and awarding specific amounts to the respective employees.
After rendition of the award the union filed a counterclaim in the Chancery action seeking judicial enforcement of the award as rendered. The cause came on for hearing, and the trial court first granted an interlocutory injunction restraining enforcement of the award (opinion reported 42 N.J. Super. 327 (Ch. Div. 1956) and then entered final *27 judgment for plaintiff vacating the award (opinion reported 44 N.J. Super. 504 (Ch. Div. 1957). Both decisions were based upon the court's determination that no arbitrable dispute was presented. On the present appeal the union maintains that the company's refusal to pay vacation pay to employees laid off after October 16, 1965 presented an arbitrable dispute under the collective bargaining agreement.
The issue before this court, then, is only the arbitrability of the dispute, and consequently, meritorious aspects of the union's claim to vacation pay are to be considered only with a view to resolution of that inquiry. Standard Oil, etc. Union v. Esso Research, etc., Co., 38 N.J. Super. 106 (App. Div. 1955); Goodall-Sanford, Inc. v. United Textile Workers, 233 F.2d 104, 107-108 (1 Cir. 1956); affirmed on other grounds, 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed. 1031 (1957). The company asserts, in defense of the determination below, that (1) the arbitrator lacked power to act because the employees, in any case, would not have been "legally entitled" to vacation pay until April 15, 1956, which was subsequent to the termination date of the collective bargaining agreement, and (2) there was no bona fide dispute as to the right to vacation pay, within the rule of the Standard Oil case, supra. If either contention of the company is maintainable, the trial court was correct in restraining enforcement of the award.

I.
The first point of the company's argument is that since, under the contract, vacation pay for the year 1956 was not payable (or determinable) until April 15 of that year, a date subsequent to the actual termination of this contract, vacation rights, even if they existed, could not have "accrued" before such termination. The company contends this circumstance defeats the arbitrator's jurisdiction, as his adjudicatory power can only extend to rights which accrue during the life of the agreement.
Prefatory to discussing this point we note that the trial court apparently did not rest its decision thereon. In its *28 initial opinion the interlocutory injunction was granted because:
"Under Article VI of the collective bargaining agreement, no employee was entitled to vacation pay unless he was in the employ of the company on April 15. No employee represented by the defendant union can qualify under that provision and it is not within the power of an arbitrator or the court to rewrite the contract." 42 N.J. Super., at page, 330, 331)
However, in rendering the final decision the court conceded that the employment status of the individual employees on April 15, 1956 was a "debatable issue" and a proper subject for arbitration, but held that:
"It seems to me to be beyond dispute that the parties intended that vacation benefits should be paid only during the life of the contract. To hold otherwise one would be compelled to disregard the plain language of that document." (44 N.J. Super., at page 506)
We defer for later consideration the merits of these two points  the employee status of the defendants on April 15, 1956 and whether the contract contemplated any vacation payments in the event of termination of the contract before that date.
Initially, the company concedes that the mere fact that the contract may have expired prior to the invocation of the arbitration process does not in itself preclude jurisdiction in that forum. This appears to be well settled. Lane v. Endicott Johnson Corp., 274 App. Div. 833, 80 N.Y.S.2d 639 (App. Div. 1948), affirmed 299 N.Y. 725, 87 N.E.2d 450 (Ct. App. 1949); G., H. & E. Freydberg v. International Ladies Garment Workers Union, 128 N.Y.S.2d 470 (N.Y. Sup. Ct. 1954); In re Potoker, 286 App. Div. 733, 146 N.Y.S.2d 616 (App. Div. 195); affirmed Potoker v. Brooklyn Eagle, Inc., 2 N.Y.2d 553, 161 N.Y.S.2d 609, 141 N.E.2d 841 (Ct. App. 1957); Application of Gottfried Oppenheimer, 140 N.Y.S.2d 521 (Sup. Ct. 1955). Nor can there be any question that a "dispute" arose during the life of the agreement, as the *29 union made its formal claim for vacation pay at least as early as February 2, 1956, and in this sense, if it be material, the grievance was "pending" during the life of the agreement. See Lane v. Endicott Johnson Corp., supra (80 N.Y.S.2d at page 641). The company rather relies herein solely on the fact that under the contract no vacation rights "accrued" or became legally enforceable until after the contract was terminated. But this, we are convinced, does not render the dispute non-arbitrable.
The scope of the arbitrator's power is, of course, to be determined by the arbitration provision itself. Standard Oil v. Esso Research, supra; Textile Workers' Union of America, etc. v. Firestone Plastics, 6 N.J. Super. 235 (App. Div. 1950); certification denied 4 N.J. 515 (1950). A more comprehensively worded arbitration clause is difficult to imagine  "Any differences or disputes between the parties whether or not a grievance." The usual language limiting arbitration to disputes concerning the "meaning (or interpretation) and application of the agreement" is not present. 3 Coll. Bar. Neg. & Con. (B.N.A.), par. 51:261-262 (1951); Note, 64 Harv. L. Rev. 1338, 1339 (1951). But even were we to read such language into the clause under construction, see In re Shook Bronze Co., 9 Lab. Arb. 656 (1948), we would still be constrained to hold the instant dispute one that concerned the "meaning or application" of the agreement. The rights asserted by the defendants, if they exist, indisputably arise out of the agreement. That the actual enjoyment of the rights claimed was to occur subsequent to the termination date does not make the dispute non-arbitrable. While collective bargaining agreements are normally made for fixed periods of time, they generally contemplate renewals and a subsisting contractual relationship between the employer and the union of indefinite duration. It will therefore be commonplace that rights to which employees are entitled under a collective bargaining agreement may not actually fructify in enjoyment until after the expiration of a given contract period with reference to which they may be regarded as having been earned.
*30 Vacation and severance benefits are apt examples. Vacation pay, as well as severance pay, has often been said to be in the nature of deferred compensation, in lieu of wages, earned in part each week the employee works, and payable at some later time. Owens v. Press Publishing Co., 20 N.J. 537, 547 (1956); In re Wil-low Cafeterias, 111 F.2d 429, 432 (2 Cir. 1940); Goodall-Sanford, Inc. v. United Textile Workers, supra; In re Potoker, supra; Div. of Labor Law Enforcement v. Ryan Aeronautical Co., 106 Cal. App.2d Supp. 833, 236 P.2d 236, 130 A.L.R.2d 347 (Super. Ct., App. Dept. 1951); In re National Casket Co., 17 Lab. Arb. 570 (1951); In re A.D. Julliard Co., 18 Lab. Arb. 896 (1952). In the case of vacation pay, that future date is usually fixed; with severance pay it is dependent on termination of employment. In this sense such benefits "accrue" during the work year, not merely on the date when they become payable. Thus understood, the rights to vacation pay substantially accrued during the life of the agreement.
The company argues, however, that since under the agreement an employee would not be entitled to vacation pay unless he had employee status on April 15, 1956, the alleged right, if it existed, could not "mature" until that date. We perceive no difference between "maturation" and "accrual." In the sense used by plaintiff they signify nothing more than that the parties contemplated enjoyment of the benefits on a date which, because of the unforeseen shutdown of the plant, occurred subsequent to the expiration of the contract. But we do not agree that this circumstance necessarily is preclusive of arbitration; neither general legal concepts nor doctrines more parochial to labor arbitration indicate such result.
That one may secure a legal remedy for breach of performance prior to the time set by the parties for that performance is nothing novel in our law. The doctrine of anticipatory repudiation provides precisely such a remedy where it is applicable. See 4 Corbin, Contracts (1951), § 959, p. 852. The right to vacation pay could become "legally enforcible" prior to April 15, in that remedies could *31 be available, without doing violence to any fundamental concepts of the nature of legal rights and obligations. Specifically, to the extent that the argument assumes that termination of the agreement prior to April 16 defeats the right to vacation pay for that year, it must be rejected because it assumes the very question to be answered by the arbitrator  whether or not vacation benefits would be payable in such a case  and that question, if fairly debatable (see II, infra), is a "difference or dispute" that arises out of the contract. Under Article IX thereof, the proper tribunal to resolve it is the arbitrator.
The company also urges that the presence of a no-strike clause is supportive of its position. While we agree that agreements for arbitration have been generally viewed as the quid pro quo for the no-strike clause, Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 455, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), this is not at all material to the instant issue. Plaintiff argues that since the union could not have effectively struck over this dispute, it should not be entitled to arbitrate the matter. The argument is spurious for several reasons.
First, while arbitration can, in one sense, be viewed as a substitute for more violent and disruptive methods of determining labor disputes, its specification in a bargaining, agreement also evidences a preference by the parties for airing their differences in a forum where specialized knowledge and simplified procedures are available, rather than in the presumably more cumbersome judicial arena. Second, while arbitration and no-strike clauses may be mutually bartered couplets in the bargaining process, it does not follow that the allowable scope of the former is co-extensive with the utility of the latter. Arbitration will be compelled even after the possibility of strike has been removed because of cessation of the company's operation. See Goodall-Sanford v. United Textile Workers, supra; Textile Workers Union v. Lincoln Mills, supra. Lastly, the instant dispute actually arose during the term of the contract, while the company was receiving the literal, if not practically significant, benefit *32 of the no-strike provision. (See Freidin, Labor Arbitration and the Courts (1952), p. 12, where administrative decisions indicating the converse, i.e., that the no-strike clause is inapplicable to any non-arbitrable dispute, are soundly criticized.)
It must be conceded that where, as here, the actual dispute between the parties arises during the contract term and it pertains to vacation rights which are alleged to have accrued during the contract period, although not to be enjoyed until after the expiration of the contract, the dispute is sufficiently integrated with the contract term to be arbitrable, especially in view of the unfettered language used in the arbitration clause.
Both parties cite In re Potoker, supra, as supportive of their positions. In that case the arbitrability of disputes concerning severance pay and other fringe benefits, including vacation pay, was at issue. The trial court held that the claims to vacation pay were arbitrable to the extent based on services rendered prior to termination of the contract (141 N.Y.S.2d at page 722). The company did not dispute this holding on the subsequent appeals. Nor does it appear from the opinions whether under the contract the disputed vacation benefits were payable at a date before or after the contract was eventually terminated. It is also interesting to note that the New York Appellate Division, in holding the severance pay claim arbitrable despite the fact that such benefits were not payable until employment had terminated, which in this case was after termination of the contract, characterized as "tenable" the union's contention that severance pay accrues contemporaneously with rendition of services over the years, the payment merely being deferred and hence surviving the termination of the agreement. It went on to say:
Any inquiry, however, to determine whether or not such claim, or any claim, arises after the termination of the contract goes to the merits * * *." (146 N.Y.S.2d, at p. 620),
and hence was within the arbitrator's province alone.
*33 The majority of the Court of Appeals affirmed, and while the dissent spoke of the date upon which the employee became "legally entitled to these fringe benefits" as decisive (2 N.Y.2d 553, 161 N.Y.S.2d at page 615, 141 N.E.2d at page 845), we deem the approach and result reached by the majority of the court more soundly conceived.
Nor did Textile Workers Union v. Firestone Plastics, supra, present the question under discussion here. That case merely held that no bona fide dispute existed as to the right, in the circumstances of that case, to vacation benefits. It was not concerned with the direct effect of contract termination on arbitrability.

II.
We now turn to the argument that no bona fide dispute could be said to have existed as to the right to vacation benefits.
The mere assertion of a contention as to the meaning of an agreement or as to the connotation of contractual language, obviously at odds with its plain intendment, does not create an arbitrable issue. Standard Oil Development Co. v. Esso Research, supra (38 N.J. Super., at page 114), citing, inter alia, International Assn. of Machinists v. Cutler-Hammer, Inc., 271 App. Div. 917, 67 N.Y.S.2d 317 (App. Div. 1947), affirmed 297 N.Y. 519, 74 N.E.2d 464 (Ct. App. 1947), noted 47 Colum. L. Rev. 1243 (1947). The dispute must be bona fide  both disputants must be advancing positions that are reasonably tenable in light of the contract language and any relevant extrinsic circumstances. This doctrine has been said to permit a party to resist arbitration where the court believes the question sought to be arbitrated is answered "beyond peradventure" by the text of the contract. Freidin, op. cit., supra, page 7. It is presumably bottomed on the interdiction contained in most arbitration clauses, including the instant one, against enlargement or modification of the agreement by the arbitrator. The test to determine if a given dispute is bona *34 fide has already been articulated by this court in the Standard Oil case thusly:
"* * * [A]rbitration will be directed when it appears to the mind of the ordinary layman that the particular language involved is reasonably open to the connotation contended for. If the contention proposed is such that no ordinary layman, acting in good faith, would seriously advance it, then our statutory power will not be exercised." (38 N.J. Super., at page 115)
The position of the employer on the merits is that the obligation to pay vacation benefits is, under the contract, dependent on the specific conditions (1) that the employee must be in the employ of the employer on each April 15, and (2) the April 15 date applicable to any vacation period claimed must fall during "the life of this agreement." It is contended to be beyond reasonable debate that neither condition was met by the union in respect to vacation pay for the year 1956 and that the claims asserted are therefore frivolous. We note, preliminarily, that the clause, "during the life of this agreement," appears only in that part of the contract which concerns employees of less than five years' employment. We are informed that the great majority of the employees had in excess of five years' employment status by April 15, 1956.
We consider first condition (1) referred to above. The contention of the union is that considering that vacation pay is in the nature of deferred compensation for services rendered in the year preceding the vacation period, the discontinuance of the plant prior thereto, but after rendition of substantial services, does not ipso facto defeat vacation benefits. Secondly, even if employee status as of April 15 be deemed a condition prerequisite to vacation benefits, yet under Article XI-1(, titled "Termination of Seniority and Employment," which lists the reasons for termination of employment, i.e., loss of "continuous employment record," that status did not cease to exist for these employees as they had not been "laid off" for two years or more, nor were they subjects of any of the other termination conditions *35 specified. Further, the union asserts that the provision denying vacation benefits to employees who, as of April 15, had been laid off for six months or more, by necessary inference grants vacation benefits to those laid off for a lesser period, i.e., subsequent to the preceding October 15. In sum, the argument is that, as held by the arbitrator, these employees had employment status with the company on April 15, 1956 "for vacation pay purposes" and had earned and were entitled to the allowance.
We voice no opinion as to whether or not we would accept any or all of the above as correct interpretations of the contract or whether, if it were our function, we would decide the meritorious issue in the union's favor. But we do believe that its resolution in favor of the union is not so unreasonable as to compel the conclusion that the claim by the union is not bona fide. The precise situation which eventuated here was not expressly covered by the language of the agreement. This in itself may be argued to militate in favor of the bona fides of the dispute. See Goodall-Sanford, supra (233 F.2d, at page 110), where a similar claim was held arbitrable.
Many similar disputes involving claims to vacation pay where the company had terminated operations prior to the date that vacation pay was payable under the contract and where the contract made no dispositive provision for such contingency have been decided by arbitrators favorably to the employees. See, e.g., In re Brookford Mills, 28 Lab. Arb. 838 (1957); In re A.D. Julliard, supra; In re Catoir Silk Co., 13 Lab. Arb. 368 (1944); In re North Star Woolen Mill Co., 14 Lab. Arb. 185 (1950); Mays Landing Water Power Co., 12 Lab. Arb. 860 (1949); see also In re National Casket Co., supra; In re Kleene Fibre Corp., 21 Lab. Arb. 234 (1953). See also the meritorious disposition in favor of the union in Textile Workers Union v. Paris Fabric Mills, supra; but cf. Textile Workers Union v. Firestone Plastics, Inc., supra.
With reference to condition (2) of liability, mentioned above as asserted by the employer, i.e., the required incidence *36 of April 15 "during the life of this agreement," the union argues that since, as developed in the foregoing exposition of its position as to the nature of vacation benefits, 1956 vacation pay had already been earned by April 15, 1956, its payment cannot be forestalled by the non-occurrence of a condition caused by the employer's unilateral act of terminating the agreement as of March 15, 1956. It might also be colorably contended on behalf of the union (although we express no considered opinion on the merits of such a contention) that the reference to the life of the agreement simply means that vacation pay under the schedules of the agreement is payable only in respect to services rendered during, or properly referable to the period of the agreement. Within the broad philosophy expressed in the Standard Oil case, supra, concerning the appropriate scope of judicial deference to the arbitration process, we conclude that neither of the foregoing possible answers to the meritorious defense of the employer in respect to the condition here being considered is so frivolous as to be regarded as incapable of being advanced in good faith. The arbitrator's jurisdiction was not defeated by the nature of the merits of the controversy.

III.
For the above reasons the judgment enjoining enforcement of the award must be reversed. The defendants' counterclaim for enforcement of the award was not considered independently by the parties on this appeal, evidently because they deemed resolution of the main claim dispositive. Since no other reason for refusing enforcement has been advanced here or is manifest from the present record (see N.J.S. 2A:24-8), we will enter judgment for defendants on their counterclaim.
Reversed and judgment entered for defendants on the counterclaim.