[L. A. 26239. In Bank. June 29, 1961.]

JEROME POSNER, as Manager of Los Angeles Joint Board, Amalgamated Clothing Workers of America, Plaintiff and Appellant, v. GRUNWALD-MARX, INC., Defendant and Respondent.

Wirin, Rissman, Okrand & Posner and Paul M. Posner for Plaintiff and Appellant.

Pauline Nightingale, Effie Sparling, William P. Nutter, Milford A. Maron, Bodle & Fogel, George E. Bodle, Daniel Fogel and Stephen Reinhardt as Amici Curiae on behalf of Plaintiff and Appellant.

Hill, Farrer & Burrill, Hyman Smith and Ray L. Johnson, Jr., for Defendant and Respondent.

PETERS, J.—Petitioner union brought these proceedings to compel the defendant employer, Grunwald-Marx, Inc., to arbitrate the question of vacation pay for 1957 and holiday pay for May 30, 1957 (Decoration Day), which pay the union contends is owed to its members.

Both the union and the employer rely on a collective bargaining agreement entered into on October 1, 1953, and which, on October 23, 1956, was renewed and extended through September 30, 1959. Among other things, the agreement provided for a one-week vacation in each calendar year, based on hours and days worked during a period computed as ending with the last pay period in June of each year, which vacation was to be taken in the first week of July in the absence of a mutual agreement as to some other period. It also provided that, as a requirement of eligibility for the paid vacation, an employee must have been on the company pay roll nine months prior to the commencement of the vacation period and at the commencement of the vacation period; and that any employee who quit or was discharged for cause prior to the vacation period lost his rights to vacation pay. The agreement provided for May 30th (Decoration Day) as a paid holiday and required for eligibility that an employee must work the last working day before the holiday and the first working day after the holiday. Under the agreement an employee was entitled to holiday pay if he did not work any of these days due to illness or layoff.

On or about May 29, 1957, defendant employer moved its plants from Los Angeles County to Phoenix, Arizona, and "terminated" its employees. The collective bargaining agreement did not expressly provide for the contingency of the plant's removal or the "termination" of the employees.

The arbitration provision of the collective bargaining agreement provided, in part, that: "A complaint, grievance or dispute arising between the parties relating directly or indirectly to the provision[s] of this agreement whether concerning discharges or any other terms thereof shall in the

first instance be taken up for adjustment by a representative of the Union and a representative of the Company. In the event that they are unable to adjust the same then such matters shall be submitted to arbitration. . . ."

Upon the refusal of Grunwald-Marx, Inc., to pay vacation pay for 1957, or holiday pay for May 30, 1957, or to arbitrate these matters, the union, pursuant to section 1282 of the Code of Civil Procedure, filed a petition for an order directing arbitration. The petition was then withdrawn because the employer voluntarily agreed to arbitrate, and then again filed when the employer refused to proceed with the arbitration.

The trial court denied the petition and ordered the proceedings dismissed. It concluded that Grunwald-Marx, Inc., was not in default under the arbitration provisions of the collective bargaining agreement because "The wording of the collective bargaining agreement is without ambiguity as to vacation pay and holiday pay."

In thus limiting the arbitration clause of the agreement, the trial court adopted the older of two conflicting rules for the interpretation of such provisions found in collective bargaining agreements. It purported to apply the so-called "Cutler-Hammer" doctrine, which is that: "While the contract provides for arbitration of disputes as to the 'meaning, performance, non-performance or application' of its provisions, the mere assertion by a party of a meaning of a provision which is clearly contrary to the plain meaning of the words cannot make an arbitrable issue. . . . If the meaning of the provision of the contract sought to be arbitrated is beyond dispute, there cannot be anything to arbitrate and the contract cannot be said to provide for arbitration." (*International Assn. of Machinists* v. *Cutler-Hammer, Inc.*, 271 App.Div. 917 [67 N.Y.S.2d 317, 318], affd. 297 N.Y. 519 [74 N.E.2d 464].) This doctrine has never been affirmed by this court. It has received sharp academic criticism[1] and

---

[1]Jalet, *Judicial Review of Arbitration: The Judicial Attitude* (1960), 45 Corn. L.Q. 519; Cox, *Reflections Upon Labor Arbitration* (1959), 72 Harv. L. Rev. 1482; Gregory, *The Law of the Collective Agreement* (1959), 57 Mich. L. Rev. 635; Cox, *Current Problems in the Law of Grievance Arbitration* (1958), 30 Rocky Mtn. L. Rev. 247; Kharas and Koretz, *Judicial Determination of the Arbitrable Issue* (1956), 11 Arb. J. 135; Summers, *Judicial Review of Labor Arbitration or Alice Through the Looking Glass* (1952), 2 Buffalo L. Rev. 1; Syme, *Arbitrability of Labor Disputes* (1951), 5 Rutgers L. Rev. 455; and Scoles, *Review of Labor Arbitration Awards on Jurisdictional Grounds* (1950), 17 U. Chi. L. Rev. 616. See also Mayer, *Judicial "Bulls" in the Delicate China Shop of Labor Arbitration* (1951), 2 Lab. L.J. 502. Also critical of "judicial intervention," without expressly referring to the "Cutler-Hammer Doc-

little "academic" support.[2]

An entirely different rule was adopted by the United States Supreme Court in a series of three significant cases decided last June.[3] This rule is to the effect that, where the collective bargaining agreement provides for arbitration of all disputes pertaining to the meaning, interpretation and application of the collective bargaining agreement and its provisions, any dispute as to the meaning, interpretation and application of any specific matter covered by the collective bargaining agreement is a matter for arbitration. Doubts as to whether the arbitration clause applies are to be resolved in favor of coverage. The parties have contracted for an arbitrator's decision and not for that of the courts. The high court declared that "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." (*United Steelworkers* v. *American Mfg. Co., supra,* 363 U.S. 564, 567-568.) The court also carefully pointed out that the parties may exclude a particular grievance from arbitration either in the collective bargaining agreement or in a written collateral agreement. (*United Steelworkers* v. *Warrior & Gulf Navigation Co., supra,* 363 U.S. 574, 584-585.)

▆ This federal rule is not binding on this court in the instant case because petitioner failed to allege that the employer was engaged in interstate commerce. Moreover, the trial court found the employer's allegation (in an affirmative

---

trine," are Feinsinger, *Enforcement of Labor Agreements—A New Era in Collective Bargaining* (1957), 43 Va. L. Rev. 1261; Shulman, *Reason, Contract and Law in Labor Relations* (1955), 68 Harv. L. Rev. 999; and Cox, *Grievance Arbitration in the Federal Courts* (1954), 67 Harv. L. Rev. 591.

[2]Marceau, *Are All Interpretations "Admissible"?* (1957), 12 Arb. J. 150; Herzog, *Judicial Review of Arbitration Proceedings — A Present Need* (1955), 5 DePaul L. Rev. 14.

[3]*United Steelworkers* v. *American Mfg. Co.,* 363 U.S. 564 [80 S.Ct. 1343, 1363, 4 L.Ed.2d 1403, 1432]; *United Steelworkers* v. *Warrior & Gulf Navigation Co.,* 363 U.S. 574 [80 S.Ct. 1347, 4 L.Ed.2d 1409]; and *United Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U.S. 593 [80 S.Ct. 1358, 4 L.Ed.2d 1424].

defense) that it was engaged in interstate commerce to be false. (See *Textile Workers Union* v. *Lincoln Mills*, 353 U.S. 448, 456 [77 S.Ct. 912, 1 L.Ed.2d 972]; *McCarroll* v. *Los Angeles County etc. Carpenters*, 49 Cal.2d 45, 59-60 [312 P.2d 322].) ▮ But there are strong policy reasons why the federal rule is preferable. Certainly, uniformity is desirable. In view of the complex state of industry in this country, the majority of the major collective bargaining agreements necessarily relate to interstate commerce, and so they, of course, are governed by the federal rules. And, as petitioner union pointed out at oral argument, most large unions utilize a standard contract which they seek to have signed by the various employers whether such employers are engaged in either intrastate or interstate commerce. Certainly it would seem that in reference to the interpretation, scope and application of such contracts, uniformity is to be desired. ▮ It must also not be forgotten that "arbitration agreements in labor contracts are primarily designed to prevent strikes and other expressions of unrest by a prompt and equitable settlement of labor disputes, and not merely, as in the case with other arbitration agreements, to avoid the formalities, the delay, the expense, and vexation of ordinary litigation." (31 Am.Jur., Labor, § 114, p. 479.) ▮ Moreover, in favor of the federal rule it should be noted that the "Cutler-Hammer" doctrine is based on a strict and technical application of ordinary contract law, while the rule adopted by the United States Supreme Court properly takes into consideration the peculiar nature of the collective bargaining agreement. In this regard, the Supreme Court, in the American Manufacturing Company case noted that "[S]pecial heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve" and that "The collective agreement requires arbitration of claims that courts might be unwilling to entertain. In the context of the plant or industry the grievance may assume proportions of which judges are ignorant. Yet, the agreement is to submit all grievances to arbitration, not merely those that a court may deem to be meritorious." (363 U.S. at p. 567.)

Solicitor General (formerly Harvard Law Professor) Archibald Cox in *Reflections Upon Labor Arbitration* (1959), 72 Harv.L.Rev. 1482, at page 1489, observed that "there are as wide differences in the substantive rules and precepts of contract interpretation applicable to different kinds of com-

mercial contracts as there are between 'ordinary contracts' and collective-bargaining agreements.'' As unique characteristics of a collective bargaining agreement, Cox described the number of people affected and the complexity of their interests; the ''wide range of conduct'' and ''enormous variety of problems'' covered in a collective bargaining agreement which must ''be kept short and simple enough for the ordinary worker to read and understand,'' and so results in an inevitable verbal incompleteness. He pointed out that a labor contract operates prospectively over substantial periods so that one can hardly foresee all the problems that will develop in an industrial establishment even in a single year and more scope must be left for decisions made in the course of performing the agreement; and that the parties share a degree of mutual interdependence seldom associated with simple contracts, and that sooner or later an employer and his employees must strike some kind of a bargain. ''The pressure to reach agreement is so great that the parties are often willing to contract although each knows that the other places a different meaning upon the words and they share only the common intent to postpone the issue and take a gamble upon an arbitrator's ruling if decision is required.'' (72 Harv.L.Rev. at p. 1491.) ''The resulting contract is essentially an instrument of government, not merely an instrument of exchange. . . . It is largely for these reasons that collective-bargaining agreements provide their own administrative or judicial machinery —the ascending steps of the grievance procedure culminating in final and binding arbitration.'' (72 Harv.L.Rev., p. 1492.) These observations seem to be sound. (See also Chamberlain, *Collective Bargaining and the Concept of Contract* (1948), 48 Columb.L.Rev. 829; Shulman, *Reason, Contract and Law in Labor Relations* (1955), 68 Harv.L.Rev. 999.)

In the Warrior & Gulf Company case, the high court declared that ''The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of the particular industry or of a particular plant. As one observer [Cox, in 72 Harv.L.Rev. 1482, *supra*, at pp. 1498-1499] has put it:

'' '. . . [I]t is not unqualifiedly true that a collective-bargaining agreement is simply a document by which the union

and employees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement. We must assume that intelligent negotiators acknowledged so plain a need unless they stated a contrary rule in plain words.' '' (363 U.S. at pp. 578, 580.)

The United States Supreme Court applied these principles to three different factual situations.

In the American Manufacturing Company case the collective bargaining agreement provided for arbitration of all disputes between the parties as to the meaning, interpretation and application of the provisions of the agreement. The agreement also provided that the employer would "employ and promote employees on the principle of seniority 'where ability and efficiency are equal.' '' (363 U.S. at p. 565.) An injured employee left work and brought an action for compensation benefits. The case was settled, his doctor expressing the opinion that the injury had made him 25 per cent "permanently partially disabled." The district court held that he was estopped to claim any seniority or employment rights upon his return to work. The court of appeals affirmed, holding that the grievance was "a frivolous, patently baseless one, not subject to arbitration under the collective bargaining agreement." The high court reversed, concluding that there was a dispute as to the meaning, interpretation and application of the collective bargaining agreement and that arbitration should have been ordered.

In the Warrior & Gulf Company case the grievance procedure provided that "matters which are strictly a function of management shall not be subject to arbitration under this section" and that "[s]hould differences arise . . . as to the meaning and application of the provisions of this Agreement ... [and] if agreement has not been reached," the matter shall be subject to arbitration. The employer reduced his work force

and contracted out certain maintenance work previously done by its employees. The party contracting to do the maintenance work hired some of the laid-off employees at reduced wages. The district court refused to compel arbitration, holding that the agreement did not "confide in an arbitrator the right to review the defendant's business judgment in contracting out work." The court of appeals affirmed, holding that the contracting out was a function of management, which function had been withdrawn from the grievance procedure by the collective bargaining agreement. The high court held that "The grievance alleged that the contracting out was a violation of the collective bargaining agreement. There was, therefore, a dispute 'as to the meaning and application of the provisions of this Agreement' which the parties had agreed would be determined by arbitration." (363 U.S. at p. 585.)

In the Enterprise case the collective bargaining agreement provided that any differences as to the meaning and application of the agreement should be submitted to arbitration and that the arbitrator's decision was final and binding on the parties. It also provided that if an arbitrator in accordance with the grievance procedure determined that the employee had been suspended unjustly or discharged in violation of the provisions of the agreement, he was to be reinstated and paid full compensation for time lost. And it provided that all disputes would be settled in the manner outlined for the adjustment of grievances. When a number of employees were "discharged" after leaving their jobs in protest against the discharge of another employee, arbitration was sought and ordered by the district court. The arbitrator found that the discharge of the men was not justified, although their conduct was improper. He also rejected the contention that the fact that the collective bargaining agreement had expired barred reinstatement of the employees. He awarded reinstatement with back pay, minus pay for a 10-day suspension and sums received in other employment. After the employer refused to comply with the award, the district court directed compliance. The court of appeals held that the failure of the award to specify the amounts to be deducted from the back pay rendered the awards unenforceable, and that an award for back pay subsequent to the date of termination of the collective bargaining agreement and reinstatement of the discharged employees was unenforceable because the collective bargaining agreement had expired. The high court concluded that the reinstatement and back pay portions of the award

should be affirmed as based on the arbitrator's construction of the collective bargaining agreement and modified the district court judgment so that the amounts due the employees might be definitely determined by arbitration.

■ Our own state policy favors arbitration provisions in collective bargaining agreements, and recognizes the important part that they play in helping to promote industrial stabilization. Section 1280 of the Code of Civil Procedure provides that "A provision in a written contract to settle by arbitration a controversy thereafter arising out of the contract or the refusal to perform the whole or any part thereof . . . shall be valid, enforceable and irrevocable. . . ." And section 1282 of the Code of Civil Procedure provides in part that "A party aggrieved by the failure, neglect or refusal of another to perform under an agreement in writing providing for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." In holding those provisions applicable to collective bargaining agreements, the court in *Levy* v. *Superior Court*, 15 Cal.2d 692, noted at page 704 [104 P.2d 770, 129 A.L.R. 956], that "arbitration under collective bargaining agreements has been one of the most potent factors in establishing and maintaining peace and protection in industry [citing authorities]. . . ." *Chavez* v. *Sargent*, 52 Cal.2d 162, at page 197 [339 P.2d 801], declared that "State laws as they should be interpreted and applied, at least since the 1947 and subsequent enactments, continue to permit, to encourage and protect collective bargaining agreements which have been freely negotiated and entered into by and between employes' lawfully authorized organizations and their employers whereby the interests of each party may be advanced." Thus, our state policy does not substantially differ from "[t]he present federal policy which is to promote industrial stabilization through the collective bargaining agreement." (*United Steelworkers* v. *Warrior & Gulf Navigation Co., supra,* 363 U.S. 574, 578.)

It is significant that the agreement in the instant case declares that "It is the intent and purpose of the Company and the Union that this agreement shall promote and improve industrial and economic relationships between the Company and its employees" as well as to "provide for wages, hours of work and conditions of employment of the employees of the Company." There can be no doubt that the parties to the

agreement intended by entering into it to promote industrial stabilization.

Thus, this court has agreed, in general, with the federal courts as to the purpose and scope of arbitration agreements as they relate to labor controversies. While this court has neither unequivocally adopted the ''Cutler-Hammer'' doctrine nor the federal rule, there is language in several cases favoring what is now the federal rule.

One such case is *O'Malley* v. *Petroleum Maintenance Co.,* 48 Cal.2d 107 [308 P.2d 9], which determined that an employee's discharge was arbitrable (on the basis of the submission by employer and union to arbitration) although the collective bargaining agreement did not mention discharge. That case, at page 111, quoted from *Southside Theatres* v. *Moving Picture Projectionists Local,* 131 Cal.App.2d 798, at pages 802-803 [281 P.2d 31], as follows: ''Any controversy under a collective bargaining contract which requires first a determination that the contract does or does not define the rights or duties of the parties in an existing situation is subject to arbitration if the agreement provides for the arbitration of disputes that arise out of the contract.''

In *McCarroll* v. *Los Angeles County etc. Carpenters, supra,* 49 Cal.2d 45, an order granting a preliminary injunction against a union's breach of a no-strike clause in a collective bargaining agreement was affirmed. While this court there rejected the arguments that the issue involved was referable to arbitration under the collective bargaining agreement, and that the employer was precluded from maintaining the action, it expressly recognized that ''[t]he arbitrability of a dispute may itself be subject to arbitration if the parties have so provided in their contract'' (49 Cal.2d at p. 65), and that ''[a]ll strikes during the life of a contract are not necessarily violations of a no-strike clause, even though on its face the prohibition appears to be absolute.'' (49 Cal.2d at p. 66.) This latter statement is inconsistent with the ''Cutler-Hammer'' doctrine, and with the conclusion of law by the trial court that employer was not in default under the arbitration provision because ''The wording of the collective bargaining agreement is without ambiguity as to vacation pay and holiday pay.''

The McCarroll opinion declared that in every case a court must determine what power the parties have conferred on the arbitrator, whether it be the power to determine his own jurisdiction or something less. And it described the ''question''

to be determined as "whether the collective bargaining agreement requires arbitration to determine if defendants' conduct violates the no-strike clause, or whether the court itself may make this determination" and concluded that "[a]s with all problems of contract interpretation, the answer must reflect the intention of the parties." (49 Cal.2d at p. 66.)

The opinion carefully pointed out that if the only provision in the collective bargaining agreement to be considered was the one stating that " 'all grievances or disputes arising between . . . [the parties] over the interpretation or application of the terms of this Agreement shall be settled by the procedure set forth in Article V'. . . it might reasonably be argued that the question of whether a strike is in breach of contract is arbitrable since it involves interpretation of a term of the contract." (49 Cal.2d at p. 67.) This is substantially the problem now before us. The court then went on to look at the grievance procedure in article V and concluded that the steps were aimed at the usual employee complaints, that the first step was to require a grievance to be submitted to a craft steward and then reported to a special representative for adjustment, and that it was "inconceivable that the parties thought an employer would be required to follow these steps in prosecuting his objection to a strike." (49 Cal.2d at pp. 67-68.) The opinion also reasoned that " [r]esort to the [grievance and arbitration] procedure is designed to avoid the necessity of a strike, not to adjudicate a strike once it has occurred, and the purpose of the procedure limits its applicability." (49 Cal.2d at p. 68.) And it refused to broadly construe an arbitration procedure to cover all disputes between the parties to the end that the contract will provide a complete system of government for the parties because to do so would override the parties' intentions and force "on them a method of decision wholly unexpected in its application." (49 Cal.2d at p. 68.) ▮ Because petitioner union and Grunwald-Marx, Inc., did not limit the grievance procedure steps to "the usual employee complaints," it must be concluded that it was the intention of the parties that arbitration should provide a complete system of industrial self-government.

In *Weiman* v. *Superior Court*, 51 Cal.2d 710 [336 P.2d 489], a noncollective bargaining case, the parties had agreed that "Any disagreement arising out of this contract . . . shall be submitted to arbitration." This court concluded that ". . . the only 'default' which need be shown before an order for arbi-

tration may be made under section 1282 is that a 'disagreement' has arisen and that a party has refused to submit such 'disagreement' to arbitration. Any other interpretation of the section would defeat the main purpose of arbitration proceedings, which is to obtain an expeditious hearing and determination by arbitrators of any 'disagreement' which may arise." (51 Cal.2d at p. 713.)

 There are a number of District Court of Appeal opinions which interpreted arbitration clauses in collective bargaining contracts and in noncollective bargaining contracts. They include the following: *Publicists Local 818* v. *National Screen Service Corp.*, 183 Cal.App.2d 491 [7 Cal. Rptr. 238]; *Case* v. *Alperson*, 181 Cal.App.2d 757 [5 Cal.Rptr. 635]; *Lauria* v. *Soriano*, 180 Cal.App.2d 163 [4 Cal.Rptr. 328]; *Griggs* v. *Transocean Air Lines*, 176 Cal.App.2d 843 [1 Cal.Rptr. 803]; *Pari-Mutuel etc. Guild* v. *Los Angeles Turf Club*, 169 Cal.App.2d 571 [337 P.2d 575]; *Firestone Tire & Rubber Co.* v. *United Rubber Workers*, 168 Cal.App.2d 444 [335 P.2d 990]; *Solari* v. *Oneto*, 166 Cal.App.2d 145 [333 P.2d 218]; *Wetsel* v. *Garibaldi*, 159 Cal.App.2d 4 [323 P.2d 524]; *Lang* v. *Badger*, 157 Cal.App.2d 345 [320 P.2d 906]; *J. H. Pomeroy & Co.* v. *Soulé Steel Co.*, 156 Cal.App.2d 691 [320 P.2d 172]; *Straus* v. *North Hollywood Hospital, Inc.*, 150 Cal.App.2d 306 [309 P.2d 541]; *Downer Corp.* v. *Union Paving Co.*, 146 Cal.App.2d 708 [304 P.2d 756]; *Crofoot* v. *Blair Holdings Corp.*, 119 Cal.App.2d 156 [260 P.2d 156]; *Myers* v. *Richfield Oil Corp.*, 98 Cal.App.2d 667 [220 P.2d 973]; *Screen etc. Guild* v. *Walt Disney Productions*, 74 Cal. App.2d 414 [168 P.2d 983]; and *Bierlein* v. *Johnson*, 73 Cal. App.2d 728 [166 P.2d 644]. No useful purpose would be served by analyzing those cases. Some of them contain some general language and reach results that are not only inconsistent with the federal rules but are inconsistent with the O'Malley, McCarroll, and Weiman cases. At least one of them—*Pari-Mutuel etc. Guild* v. *Los Angeles Turf Club*—purports to apply the "Cutler-Hammer" doctrine. Any language found in these opinions inconsistent with the three cases above cited, and with this opinion, is disapproved.

From the above analysis, it can be safely stated that it is a fundamental part of both federal and California public policy to promote industrial stabilization through the medium of collective bargaining agreements. Certainly, it can be said that, in the instant case, both parties intended to secure, if

possible, industrial stabilization. To obtain this end the parties expressed their intent to include within the arbitration clauses of the agreement all clauses of the contract, and all disputes arising under the agreement. The action of Grunwald-Marx, Inc., in first proceeding to arbitrate is some evidence in support of the inference that it intended the vacation pay and holiday pay provisions to be arbitrable in the event of removal of its plants and "termination" of its employees. This being so, the federal rule to the effect that in such cases all disputes as to the meaning, interpretation and application of any clause of the collective bargaining agreement, even those that prima facie appear to be without merit,[4] are the subject of arbitration, is adopted by this court.

This does not mean that we adopt all of the implications of the federal cases. There is some general language in those three cases that can be interpreted as indicating a complete judicial retreat from the field of arbitration in collective bargaining cases, which could result in the arbitrary remaking of the collective bargaining agreement by an arbitrator contrary to the intentions of the parties. These implications have been criticized.[5] Certainly, such implications would be contrary to the rules already adopted in this state, and we have no intent at the present time of changing these rules.

---

[4] In his article on *Current Problems in the Law of Grievance Arbitration* (1958), 30 Rocky Mt. L. Rev. 247, at page 261, Cox writes: "The typical arbitration clause is written in words which cover, without limitation, all disputes concerning the interpretation or application of a collective bargaining agreement. Its words do not restrict its scope to meritorious disputes or two-sided disputes, still less are they limited to disputes which a judge will consider two-sided. Frivolous cases are often taken, and are expected to be taken, to arbitration. What one man considers frivolous another may find meritorious, and it is common knowledge in industrial relations circles that grievance arbitration often serves as a safety valve for troublesome complaints. Under these circumstances it seems proper to read the typical arbitration clause as a promise to arbitrate every claim, meritorious or frivolous, which the complainant bases upon the contract. The objection that equity will not order a party to do a useless act is outweighed by the cathartic value of arbitrating even a frivolous grievance and by the dangers of excessive judicial intervention." (Quoted in footnote 6 of the American Mfg. Co. case, 363 U.S., at p. 568.)

[5] Hays, *The Supreme Court and Labor Law October Term, 1959* (1960), 60 Columb. L. Rev. 901, 919-935; Davey, *The Supreme Court and Arbitration: The Musings of an Arbitrator* (1961), 36 Notre Dame Law. 138; and Note (1961), 46 Cornell L.Q. 336.

But see *The Supreme Court, 1959 Term* (1960), 74 Harv. L. Rev. 81, 178-181; Comment (1960), 34 So. Cal. L. Rev. 63; Note (1960), 59 Mich. L. Rev. 454; Note (1960), 49 Geo. L.J. 373; and Note (1960), 36 Notre Dame Law. 63.

 The proper rule is that the arbitrator of a collective bargaining agreement entered into by a labor union and an employer "serves their pleasure only, to administer the rule of law established by their collective agreement." (Shulman, *Reason, Contract and Law in Labor Relations, supra*, (1955) 68 Harv. L. Rev. 999, 1016.) The United States Supreme Court, in fact, in the Enterprise case, seemed to recognize this principle when it stated that:

"The draftsmen [of the collective bargaining agreement] may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." (363 U.S. at p. 597.)

Professor Kagel, an authority in the field of arbitration, has pointed out that the collective bargaining agreement "is a codification of much of the industrial common law, i.e., the practices of the industry or plant. Some Agreements specifically provide whether or not remaining unrecorded practices are to be recognized as additional and a substantive part of the Agreement.

"Where the parties have not made such specific provisions then to the extent that the unrecorded industrial common law does not negate or is not inconsistent with the written Agreement it becomes a substantive part of the Agreement for the purpose of interpreting that writing. Thus industrial common law, i.e., practices, are used in the grievance procedure to aid in resolving ambiguities in the written Agreement. But not to add new or contradictory terms to the Agreement."[6] Thus, the federal rule, at least limited as suggested above, is in conformity with the California cases and results in enforcing the intent of the parties.

 But even if we were not to adopt the federal rule, as thus limited, and were to adopt the "Cutler-Hammer" doctrine, nevertheless the dispute here involved would be

[6]From a paper on the Amer. Mfg. Co., Warrior & Gulf Co., and Enterprise cases, given at the annual conference of the National Academy of Arbitrators on January 27, 1961, at Santa Monica, California.

subject to arbitration. This is so because it would be unreasonable to conclude from the face of the collective bargaining agreement that the controversy between petitioner union and Grunwald-Marx, Inc., does not fall within the scope of arbitration agreed upon by both parties. In other words, it cannot be said from a reading of the holiday and vacation provisions that their meaning is so clear that there is nothing to arbitrate. The holiday pay provision requires employment on the last working day before, and the first working day after a holiday; the vacation pay provision requires (1) length of service, (2) employment at a specific date or period and (3) the taking of the vacation at a specific time. It would seem clear that the purpose of these provisions is to offer a reward of additional wages for constant and continuous service. As Judge Magruder in *Goodall-Sanford, Inc.* v. *United Textile Workers,* 233 F.2d 104, pointed out, there is an "increasingly complex use of compensation in the form of 'fringe benefits,' some types of which inherently are not payable until a time subsequent to the work which earned the benefits. . . ." (233 F.2d at p. 110.)

In a case that applied the "Cutler-Hammer" doctrine (*Botany Mills, Inc.* v. *Textile Workers Union* (1958), 50 N.J. Super. 18 [141 A.2d 107]), the interpretation of a vacation provision in a collective bargaining agreement, similar to the one before us, and its application to "terminated" employees was deemed to be a question for arbitration. In that case the employer contended that complete performance of a condition precedent was necessary before the employees could recover and the union contended that vacation payments as deferred compensation are payable if there is a rendition of substantial services. The court concluded that the dispute arose under the contract and both disputants were advancing positions that were reasonably tenable in the light of the contract language and relevant extrinsic circumstances.

■ In the instant case, it can also be argued that the vacation provisions do not require complete performance, but that the doctrine of substantial performance is applicable.

■ It is stated in 1 Witkin, Summary of California Law, Contracts, section 247, page 278, that "At common law, recovery under a contract for work done was dependent upon a complete performance, although hardship might be avoided by permitting recovery in *quantum meruit.* The prevailing doctrine today, which finds its application chiefly in building contracts, is that *substantial performance* is sufficient, and

justifies an action on the contract, although the other party is entitled to a reduction in the amount called for by the contract, to compensate for the defects. What constitutes substantial performance is a question of fact, but it is essential that there be no wilful departure from the terms of the contract, and that the defects be such as may be easily remedied or compensated, so that the promisee may get practically what the contract calls for. [Citing authorities.]''

In *Division of Labor Law Enforcement* v. *Anaconda Copper Min. Co.,* 138 Cal.App.2d 92 [291 P.2d 169], the trial court dismissed an action for wages and penalties where the employee had worked four years and eleven months of a ''required'' five-year period. The opinion commented, at page 96, as follows: ''Appellant argues that under the doctrine of substantial performance Lamon was entitled to recover 12 days' vacation pay. However, substantial performance was not pleaded in the action, and although the court gave plaintiff the opportunity to amend the complaint, plaintiff declined to take advantage of the court's order in that respect.''

The only other cases in California deciding the question of employment on a certain date as a condition for vacation pay are cases decided by the appellate department of the superior court. In *Division of Labor Law Enforcement* v. *Standard Coil etc. Co.,* 136 Cal.App.2d Supp. 919 [288 P.2d 637], the court determined that an employee was not entitled to vacation pay where he failed to comply with the condition that he be employed on June 1, 1954. The court did not discuss substantial performance. In *Division of Labor Law Enforcement* v. *Ryan Aero. Co.,* 106 Cal.App.2d Supp. 833 [236 P.2d 236, 30 A.L.R.2d 347] (cited as an authority in Witkin, *supra*), where the employee was short five working days of the required one-year period for a vacation, the court, in affirming recovery by the employee, concluded that the clause was ambiguous and did not necessarily purport to declare a condition precedent; that the purpose of the clause was ''to accomplish continuous and faithful service and as an inducement to the employee to remain in the employment'' (106 Cal.App.2d Supp. at p. 835) ; and that it (the court) was bound on appeal on the judgment roll alone to presume that any question of substantial performance was passed on by the trial court and supported by the evidence. In *Division of Labor Law Enforcement* v. *Mayfair Markets,* 102 Cal. App.2d Supp. 943 [227 P.2d 463], where an employee was

terminated after 10 months of the required 12-month period for a vacation, the court affirmed no recovery for the employee because "If there was any question of substantial performance by plaintiff it could have been litigated by the trial court on the pleadings before it, and since we have only the judgment roll before us, we must presume that that issue was passed upon by the trial court." (102 Cal.App.2d Supp. at pp. 948-949.)

Nonarbitration cases in other jurisdictions do not uniformly agree on the question of recovery of vacation pay where an employee is not "employed" on a certain date as required by the employment contract.

In *Pattenge* v. *Wagner Iron Works* (1957), 275 Wis. 495 [82 N.W.2d 172], *International Union etc. Workers* v. *L. T. Patterson Co.* (1956), 8 Ohio Op. 2d 334 [159 N.E.2d 923], and *Treloar* v. *Steggeman* (1952), 333 Mich. 166 [52 N.W.2d 647], it was concluded that the requirement of employment on a certain date was clear and unambiguous and that employees who were not employed on that date were not entitled to vacation pay. None of the three cases considered substantial performance, frustration of purpose, or waiver.

In *Textile Workers Union etc. 513* v. *Brookside Mills* (1957), 203 Tenn. 71 [309 S.W.2d 371], where the collective bargaining agreement provided paid vacations for " [a]ll employees who on . . . June 1 . . . have continuous service," the court construed this "ambiguous" provision (which it described as not clear in its meaning) in favor of employees who were terminated several months prior to June 1 by employer's decision to discontinue operations, because of "justice and equity" and "the spirit of the parties to the contract" which was reflected in the employer having previously paid vacation pay to temporarily laid-off workers. Substantial performance was not discussed.

In *Livestock Feeds, Inc.* v. *Local Union, etc. Workers* (1954), 221 Miss. 492 [73 So.2d 128], where employees brought action for vacation pay allegedly due them although they were "terminated" before the date "required" for vacation pay eligibility, the Supreme Court of Mississippi concluded that "It seems clear to us that if vacation pay is additional wages, the employee is, in justice and right, entitled to a pro-rata share thereof if the employment be earlier terminated by his employer." The same result was reached in *In re Brooklyn Citizen* (1949), 1 Misc.2d 162 [90 N.Y.S.2d 99, 105].

There are other reasonable and possible interpretations of

the contractual provisions, and extrinsic circumstances, that would support the conclusion that, even if the "Cutler-Hammer" doctrine were applied, arbitration should be ordered in the instant case.

The union, for example, has urged waiver on the part of Grunwald-Marx, Inc., in that it proceeded to arbitrate before withdrawing. "Whether there has been a waiver is usually regarded as a question of fact to be determined by the jury, or by the trial court if there is no jury." (51 Cal.Jur.2d, Waiver, § 9, p. 319.) Obviously, the determination of such a question of fact gets into the merits of the matter to be arbitrated, an activity from which courts are precluded. (*O'Malley* v. *Petroleum Maintenance Co.*, supra, 48 Cal.2d 107, 111; *Pacific Vegetable Oil Corp.* v. *C.S.T., Ltd.*, 29 Cal.2d 228, 233 [174 P.2d 441].) It is also clear that waiver does not have to be pleaded specifically in an arbitration proceeding. Stated another way, the statutory remedy for enforcing arbitration does not require the pleading of waiver. No useful purpose could be satisfied by such a requirement since courts are precluded from getting into the merits of arbitration matters.

 If the purpose of requiring employment on a certain date was to induce employees to remain in the employment, it may reasonably be argued that the purpose of the contingency was frustrated by the closing of the plant and the employees should be excused from performance of the condition precedent.

These arguments of substantial performance, waiver, and frustration of purpose are equally persuasive when applied to the question of holiday pay.

 It can also be argued that the parties did not intend that the qualification of employment on a certain date should be a condition precedent which had to be completely performed, because the vacation pay provision specifically excluded employees who quit or were discharged for cause prior to the start of the vacation period. If the contingency were an "absolute" condition precedent, no provision for quitting or being discharged for cause would have been necessary.

 Finally, it should be pointed out that section 2922 of the Labor Code which provides, in part, that "An employment, having no specified term, may be terminated at the will of either party on notice to the other" does not affect this case. The "will" of Grunwald-Marx, Inc., has been modified

by the collective bargaining agreement which governs the relationship between the parties and prevents discharge of employees except for cause.

Thus, under either the federal rule, as we see it, or the "Cutler-Hammer" doctrine, the trial court should be reversed. The judgment denying the petition and the order dismissing the proceedings are reversed.

Gibson, C. J., Traynor, J., White, J., and Dooling, J., concurred.

SCHAUER, J., Dissenting.—In my view the opinion prepared for the District Court of Appeal by Justice Lillie and concurred in by Presiding Justice Wood and Justice Fourt (reported in (Cal.App.) 10 Cal.Rptr. 54) follows the statutory and decisional law of this state. Furthermore, I think it properly upholds the integrity of the contract as specifically agreed upon by the parties and adequately discusses and correctly resolves the questions presented on this appeal.[1]

---

[1] The essence of the basic ground for the ultimate conclusion in Justice Lillie's opinion is contained in the following excerpt therefrom (brackets together, in this manner [ ], are used to indicate deletions from the opinion of the District Court of Appeal; see *People* v. *Lyons* (1956), 47 Cal.2d 311, 314 [303 P.2d 329]):

[ ] The issue sought to be arbitrated relates to portions of paragraph 9 of the agreement concerning vacations and vacation pay: "(a) Vacation Period—It is mutually agreed that there shall be a vacation period of one week in each calendar year. The period for computation shall be the period ending with the last pay period in June in each year. The vacation period shall be the first week in July unless the Company and the Union shall mutually agree upon some other period. When the vacation period occurs during a week in which a paid holiday falls, employees now entitled to receive pay for such a holiday shall be paid for such holiday in addition to their vacation pay. (b) Eligibility and Pay—1. All employees who (1) have been on the payroll of the company for at least nine (9) months prior to the commencement of the vacation period, and (2) are on such payroll at the commencement of the vacation period are eligible for a paid vacation as hereinafter provided." Another paragraph of the agreement, 11(a), provided for six paid holidays, including Decoration Day (May 30th), eligibility therefor being defined as follows: "In order to be eligible for a paid holiday, employees must work the last working day before the holiday and the first working day following the holiday. If the employee did not work either of these days due to illness or lay-off, he shall be entitled to holiday pay. In case of illness the company may require proof of illness."

[ ] On or about May 29, 1957, defendant moved the company plants from Los Angeles County to Phoenix, Arizona; its employees were "terminated." The petition alleged (and the court found) that at the time of the move and termination there were on the company payroll approximately 175 employees who had been on said payroll at the commencement of the vacation except for the removal of the company's

For the reasons therein stated, I would affirm the judgment of the trial court.

McComb, J., concurred.

plants, and that by reason of said removal the company had failed and refused to pay the employees their vacation pay.

It was further alleged that a dispute had arisen between the parties on or about May 29, 1957, concerning employees who had worked during the week of May 29th, but who were unable to work that day (May 29th) and the day following Decoration Day because of the removal of the company plants; the company, it was alleged, refused and failed to pay holiday pay for Decoration Day, and arbitration of that additional issue was likewise sought.

The trial court denied the petition. Though it found as true all the material allegations of the petition, and various affirmative defenses (save the first), as untrue, the effect of its decision was to find as true the allegations of the first affirmative defense that the petition ''fails to state facts sufficient to constitute a cause of action in that it fails to allege that the company acted illegally, arbitrarily or in bad faith in discharging its employees before the employees were eligible for vacation pay.'' [ ] In its conclusion of law, the trial court concluded that while there was an arbitration provision in the bargaining agreement and while the company had refused to arbitrate in accordance therewith, the company was not in default since ''The wording of the collective bargaining agreement is without ambiguity as to vacation pay and holiday pay''; implicit in such conclusion is the determination that there was no arbitrable issue. The judgment declared that the defendant was ''not in default in proceeding thereunder,'' and ordered the proceeding dismissed.

''The question of existence of an agreement to arbitrate and of the scope of the arbitration permissible under that agreement are issues which, in the first instance, the code refers to judicial action.'' (*Wetsel* v. *Garibaldi,* 159 Cal.App.2d 4, 7 [323 P.2d 524].) '' 'When one of the parties [as here] is resisting such an order [to arbitrate], the court must make two principal determinations . . . First, was a valid agreement to arbitrate ever made by the parties and is it still operative? Secondly, does the dispute that now exists fall within the terms of that agreement, reasonably interpreted? . . .' [citation].'' (*Local 659, I.A.T.S.E.* v. *Color Corp. of America,* 47 Cal.2d 189, 195 [302 P.2d 294].) Citing *United Steel Workers of America* v. *American Manufacturing Co.,* 363 U.S. 564 [80 S.Ct. 1343, 1363, 4 L.Ed.2d 1403, 1432], appellant suggests that we reject, as the cited case assertedly does, the ''Cutler-Hammer Doctrine'' (*International Assn. of Machinists* v. *Cutler-Hammer, Inc.,* 271 App.Div. 917 [67 N.Y.S.2d 317]); however, it is held in this state that '' 'the mere assertion by a party of a meaning of a provision which is clearly contrary to the plain meaning of the words cannot make an arbitrable issue' [*International Assn. of Machinists* v. *Cutler-Hammer, Inc., supra,* p. 318 [67 N.Y.S.2d]].'' (*Pari-Mutuel Emp. Guild* v. *Los Angeles Turf Club,* 169 Cal.App.2d 571, 579 [337 P.2d 575].) To the same effect is *Griggs* v. *Transocean Air Lines,* 176 Cal.App.2d 843, 849 [1 Cal.Rptr. 803]. Pursuant to the plain mandate of section 1282, Code of Civil Procedure, the trial court properly made the required ''threshold determination of arbitrability'' (*McCarroll* v. *Los Angeles County Dist. Council of Carpenters,* 49 Cal.2d 45, 65 [315 P.2d 322]); we are of the opinion that it correctly concluded that there was no arbitrable issue as to vacation pay. [ ]