[Civ. No. 35830. Second Dist., Div. Two. Oct. 7, 1970.]

MOUNIR J. SHAMMAS, Plaintiff and Respondent, v.
NATIONAL TELEFILM ASSOCIATES, INC., Defendant and Appellant.

## COUNSEL

Zagon, Schiff, Hirsch & Levine, James P. Schreiber and Henry A. Pattiz for Defendant and Appellant.

Greenberg, Shafton & Bernhard, Maxwell E. Greenberg, Edward B. Rasch, Paul Hartman, Sol Rabkin, Neil Jon Bloomfield, Ephraim Margolin and Lester Bise as Amici Curiae on behalf of Defendant and Appellant.

Lucas & Deukmejian, George Deukmejian and Don N. Dyer for Plaintiff and Respondent.

## OPINION

FLEMING, J.—National Telefilm Associates, Inc. (hereafter NTA) appeals a judgment and order of the superior court confirming an arbitration award of $26,000 in favor of Shammas for breach of contract and denying NTA's motion to vacate or correct the award.

*Facts*

NTA, a distributor of television films, contracted with Shammas on 24 March 1966 to supply 200 "good used 16 mm. print[s]" of feature films for a single run of each feature in Egypt. Shammas, a resident of Lebanon, agreed to pay NTA $28,000 in six monthly installments starting 1 May 1966, payments to be "drawn on a New York bank." The contract specified that NTA would ship the first 50 prints by 15 May and the balance over the next five months.

The contract was never carried out. Instead, the following events occurred:

NTA received an advice dated 3 May 1966 from Morgan Guaranty Trust Company of New York (hereafter Morgan) which reported the establishment by Arab Bank, Ltd., Beirut, Lebanon, of an irrevocable credit in NTA's favor for the amount of the first payment due under the contract. Payment was "available upon presentation to us [Morgan] of your [NTA's] drafts, at sight on us," evidencing shipment to Cairo of 50 feature films by airfreight. The advice continued: "Shipment on Israeli means or calling at Israeli ports is not allowed and documents must contain a certificate to that effect." It concluded: "This letter is solely an advice and conveys no engagement by us."

On 6 May Shammas requested that only grade 2 prints and 1950 produc-

tions be included in the first consignment of feature films shipped and that 11 substitutions be made in the list of 200 feature films in the contract. NTA's reply of 9 May rejected these requests, demurred to the shipment of as many as 50 feature films in the first consignment, and stated: "Your letter of credit also calls for shipping guarantees which are certainly none of our business and should not be in a letter of credit. We will agree the films are to be airfreight via Pan American, and following your instructions we will contact Mr. Mario Martinez and have him ship per your request—but we certainly cannot be responsible for Pan American's flight routes."

On 11 May Shammas replied: "It has been brought to my attention that there is a clause in the letter of credit which I sent you on April 25, 1966 whereby you have to present a certified commercial invoice or a certificate of origin. I have today instructed the bank to cancel this clause, hence, you need not present any invoices." Also on 11 May a cable was sent by Arab Bank to Morgan requesting negotiation of the credit against presentment of airway bills only. On 14 May Shammas again wrote NTA: "You are neither requested to guarantee shipments nor are you being held responsible for the Pan Am flight routes. This letter of credit form is the usual one that banks use here, and when I got my copy, I instructed the bank to cancel these clauses." In this letter Shammas also pointed out that the contract required that 50 feature films be shipped in the first consignment, and he renewed his request that the first consignment consist of 1950 productions and grade 2 prints.

On 8 June, NTA notified Shammas that because of his demands for numerous changes in the agreement, particularly that for "complete selectivity of product," it thereby rescinded the contract.

Pursuant to an arbitration clause in the contract Shammas brought his claim for breach of contract before a three-man tribunal of arbitrators in Los Angeles. On 20 March 1968 the arbitrators held a hearing, and Shammas testified about the formation of the contract, the subsequent communications between the parties, and the nature and extent of his damages. Bernard Tabakin, president of NTA, testified to his understanding of the contract and the subsequent communications. An expert witness discussed industry practice in grading film prints. Cables and letters relating to the controversy were introduced in evidence. On 6 June 1968 the arbitrators heard argument of counsel but postponed final decision pending the presentation of more information on the effect of the advice sent by Morgan. Letters dated 14 August 1968 and 12 December 1968 were subsequently received by the arbitrators from Morgan. The arbitrators again met on 28 January 1969, and at that time they denied NTA's request for a further

postponement to obtain more evidence from Morgan in New York. On 27 February 1969 the arbitrators made an award in favor of Shammas, but filed no findings of fact or conclusions of law.

NTA contends the judgment of the superior court confirming the arbitration award should be reversed and the award vacated because: (1) the arbitrators exceeded their powers in rendering an award contrary to public policy; (2) NTA was denied a fair hearing when the arbitrators refused a further postponement to allow it to gather more evidence; (3) in the alternative, the award should be corrected to prevent an evident miscalculation in damages.

*Public Policy*

Code of Civil Procedure section 1286.2, subdivision (d), authorizes a court to vacate an arbitration award if the arbitrators have exceeded their powers. NTA and amici curiae argue that the contract on which the arbitration award was based required that no Israeli means or ports be used to ship films; that this requirement was contrary to public policy of the United States (see Pub. Law 89-63, § 3(a), 79 Stat. 209, 50 U.S.C.A. App. § 2022, and Government Document 29-806 O, pp. 62 et seq.); that consequently the arbitrators exceeded their powers in awarding damages for breach of a contract which contained an invalid condition. (*Black v. Cutter Laboratories*, 43 Cal.2d 788 [278 P.2d 905], cert. den. 351 U.S. 292 [100 L.Ed. 1188, 76 S.Ct. 824].)

We do not reach the substance of this argument because it is based on the premise that the shipping restrictions became a part of the contract, a premise not supported by the record. The evidence showed that although shipping restrictions were initially included in the Arab Bank credit, they were almost immediately withdrawn. Shammas' letters of 11 May and 14 May and the cable from Arab Bank to Morgan clearly stated that NTA was no longer required to present invoices which would contain proof of compliance with the shipping restrictions. From that point in time until long after the rescission of the contract the subject was never again brought up by NTA.

■ This issue was considered in the arbitration proceedings. NTA's attorney, in his summation, framed the question as one of the most important of the proceedings. *"Were there, in fact, conditions imposed in the Letter of Credit, and otherwise, which did not conform to the March 24th agreement and therefore were so inconsistent with it as to amount to a default by reason of the fact that the distribution never contemplated such new conditions which are found in Exhibit A, and were these ever, in fact, cured."* (Italics added.) Since the award of the arbitrators went against

NTA and since every intendment of validity must be given the award (*Lauria* v. *Soriano,* 180 Cal.App.2d 163, 167 [4 Cal.Rptr. 328]), it must be presumed that the arbitrators recognized the validity of the withdrawal of the shipping restrictions.

Furthermore, correspondence between the parties clearly indicated that performance of the contract foundered on disputes between the parties over the grade of prints, age of product in the initial consignment, and selectivity of product—not invalidity of shipping instructions. NTA's letter of 8 June 1966 rescinding the contract did not mention shipping restrictions, but gave as its reason for rescission Shammas' demands for changes in the terms of the contract, particularly that for "complete selectivity of product." Since the shipping restrictions did not remain an operative part of the contract we do not consider whether the imposition of such restrictions would make an award of the arbitrators for breach of contract contrary to public policy. (*Freeman* v. *Jergins,* 125 Cal.App.2d 536, 540 [271 P.2d 210].)

*Refusal to Postpone the Hearing*

Code of Civil Procedure section 1286.2, subdivision (e), requires a court to vacate an arbitration award if the rights of a party have been substantially prejudiced by a refusal of arbitrators to postpone a hearing upon sufficient cause or a refusal to hear evidence material to the controversy. NTA contends it was substantially prejudiced by the refusal to postpone, first, because it needed time to obtain more evidence from Morgan to show that the restrictive shipping conditions had not been withdrawn, second, because it needed time to show that the New York credit did not amount to an irrevocable letter of credit and might not have been honored.

On the issue of shipping restrictions, we believe the pendency of the arbitration proceedings from January 1967 through January 1969 provided ample time for both parties to procure evidence on the issue. In view of the documents in the record explicitly covering this subject we think further postponement to pursue this issue was unnecessary.

On the issue of the New York credit, the question is whether the credit tendered complied with that called for under the contract. NTA argues that because the credit was not an irrevocable letter of credit issued by a New York bank there was nothing to show that Morgan would have made payment if in fact films had been shipped to Egypt and a draft drawn on Morgan in New York. This issue was susceptible of resolution by the arbitrators in two ways, one factual and one legal, either of which was suffi-

cient to support the award. Factually, the arbitrators received letters from Morgan dated 14 August 1968 and 12 December 1968 which declared that Morgan would have paid a draft promptly. However, we need not rely on this evidence nor are we required to determine the extent to which the arbitrators gave it consideration for the issue is susceptible of resolution in the same fashion as a legal question. ■ Legally, the question is whether the contract provision for "payments . . . drawn on a New York bank" required the issuance of an irrevocable letter of credit by a New York bank or whether it was satisfied by the arrangements made for presentation of a draft on Morgan in New York as correspondent bank for Arab Bank's irrevocable letter of credit. In view of the absence of any objection by NTA at the time Shammas made his arrangements for payment, we think the arbitrators were entitled to conclude that these arrangements had been acceptable to NTA and that as a matter of law they satisfied the contract provision for "payments . . . drawn on a New York bank." Had NTA wished to require payment by irrevocable letter of credit issued by a New York bank it could have so specified in the contract. It did not do so, and hence the arbitrators could have concluded that the credit arrangements made satisfied the contract provisions for payment by draft on a New York bank, and hence there was no need for further postponement of the proceedings to obtain additional evidence on availability of funds.

### The Amount of the Award

Code of Civil Procedure section 1286.6, subdivision (a), provides that a court shall correct an arbitration award when there has been an evident miscalculation of figures. NTA contends there was evident miscalculation here because the "facts disclose a total absence of proof to support an award of $26,000."

This contention fails for two reasons. ■ First, a court has no power to review the sufficiency of the evidence in an arbitration proceeding. (*Lauria v. Soriano,* 180 Cal.App.2d 163 [4 Cal.Rptr. 328].) Second, Shammas testified he had contracted to sublicense the feature films for $78,000, and we must assume that the arbitrators accepted a portion of this figure as the amount of Shammas' net damages. ■ Arbitrators are not required to find facts or draw conclusions (*Pacific Vegetable Oil Corp. v. C. S. T., Ltd.,* 29 Cal.2d 228, 232 [174 P.2d 441]), and they did not do so here. ■ Since there is no way to determine how or why the arbitrators arrived at their particular figure, any error in the amount of damages is suppositional, not evident, and Code of Civil Procedure section 1286.6, subdivision (a), does not apply. (See *William B. Logan & Associates* v.

*Monogram Precision Industries,* 184 Cal.App.2d 12, 17 [7 Cal.Rptr. 212], construing identical language in former Code of Civil Procedure section 1289, subdivision (a).)

The judgment is affirmed.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied November 4, 1970, and appellant's petition for a hearing by the Supreme Court was denied December 3, 1970.