[Civ. No. 44500. First Dist., Div. One. Dec. 19, 1979.]

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 614, SEIU, AFL-CIO, Plaintiff and Appellant, v. COUNTY OF NAPA, Defendant and Respondent.

## COUNSEL

Van Bourg, Allen, Weinberg & Roger and Stewart Weinberg for Plaintiff and Appellant.

Stephen W. Hackett, County Counsel, and Joseph C. Folkard, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**ELKINGTON, Acting P. J.**—The instant appeal was taken by the above named plaintiff (Union) from a judgment of the superior court

denying a writ of mandate which would have compelled the County of Napa (County) to arbitrate a "grievance" of one of its members, a County civil service employee, who will hereafter be designated as the "employee."

We have considered the record, the briefs of the respective parties, and also the learned dissent of our esteemed colleague. We conclude, for the reasons we now state, that the judgment of the superior court was without error, and that it must be affirmed.

The basis issue of the appeal is whether the evidence before the superior court, under apposite law, required issuance of such a writ as was sought by the Union.

The trial's evidence established the following.

The Union had been the recognized representative of the County's civil service employees, including the employee.

The County had provided by ordinance for "merit salary step increases" for certain of its civil service employees whose performance evaluations were found to be satisfactory. Those whose performance was found unsatisfactory were denied the increase. It was further provided that: *"No step increase shall be deemed automatic, but shall be given only for performance of satisfactory service, on the recommendation of department heads . . . ."* (Italics added.)

An ordinance of the County had provided for *discipline for misconduct* of civil service employees, subject to review under certain administrative procedures.

During each of the years 1975, 1976 and 1977, the occasional denial of merit salary step increases had been a source of much dispute between the Union and the County.

Also, during each of those years, under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) the County and the Union had "met and conferred" on matters of their mutual concern. Following each session the parties entered into a "Memorandum of Understanding" which was approved by the County's legislative body and thus became a binding agreement. (See *Glendale City Employees' Assn., Inc.* v. *City of Glen-*

*dale* (1975) 15 Cal.3d 328, 337 [124 Cal.Rptr. 513, 540 P.2d 609] [cert. den., 424 U.S. 943 (47 L.Ed.2d 349, 96 S.Ct. 1411)].) That document will hereafter be termed the Agreement.

At the first of the parties' "meet and confer" sessions in 1975 an understanding was reached, and the Agreement provided, for *"binding arbitration"* of civil service employee *"grievances"* that were not resolved by the previously provided "administrative steps." And it was further agreed:

"For a grievance to be reviewable [by arbitration], it must involve a disagreement over the *interpretation, application, or compliance with the terms of the Memorandum of Understanding;* or involve *a disciplinary action* or a discharge *of a permanent employee."* (Agreement, § 7.1; italics added.)

When the parties held their 1976 "meet and confer" session the County "proposed a definition of the term discipline." ("[A]t the table the question of merit increases denials was never spoken about" as discipline or otherwise.) An acceptable definition was reached "as a result of negotiations...." It follows:

*"'Discipline' consists of dismissal, suspension, letter of reprimand, demotion, or reduction in class or salary."* (Italics added.)

The above noted provisions were continued in effect by the parties' 1977 Agreement.

In none of the sessions, or their resulting Agreements, was it provided, or suggested, that the County's denial of a merit salary step increase constituted imposition of discipline, or should follow or was otherwise related to the imposition of such discipline.

Thereafter *the employee* was denied a merit salary step increase because his work performance evaluation was found unsatisfactory by the County. His "grievance" was rejected at the several administrative levels. The Union then, for the first time, contended that such a denial was *arbitrable* under the Agreement. The supportive theory was that the Agreement required, as a condition precedent to the denial, a "letter of reprimand" or "disciplinary action."

Upon the County's rejection of the requested arbitration, the instant mandate proceedings were commenced. The Union sought thereby an order compelling the County "to submit to arbitration the issue of whether or not the Memorandum of Understanding and the ordinance or resolution adopting the Memorandum of Understanding compel the taking of disciplinary actions such as a Letter of Reprimand prior to invoking any adverse personnel action such as the declination of a step increase."

At the trial's commencement the Union, while maintaining that mandate was an appropriate procedure, nevertheless requested that the matter be alternatively considered as if it had filed a petition to compel arbitration under the California Arbitration Act as well. Although the trial court appears to have then denied the motion, it and the parties nevertheless proceeded to a trial and determination of the issue whether or not such arbitration should be compelled. Neither of the parties contends that the procedure was otherwise, nor does either claim resulting prejudice.

The superior court ruled that the Agreement *did not* provide for arbitration of such a dispute. The court also stated: "If the phrase, 'merit or a step increase' is to mean anything as the term is used in [the] Ordinance, it means that a step increase shall not be automatic but rather is a kind of reward that is to be earned. *To withhold it is not an affirmative act of discipline.* It is only a determination that a reward has not been earned. Merit salary increases mean more than the passage of a period of time within which an employ [*sic*] was not discharged." (Italics added.)

Judgment was entered accordingly. The instant appeal is from that judgment.

The Union first contends that: "The petition for writ of mandamus is an appropriate remedy."

As we have pointed out, the parties and the trial court did, in effect, treat the Union's mandate petition as a petition to compel arbitration which, at least ordinarily, is the more appropriate remedy. We shall also so treat it, for the County has pointed out no resulting prejudice from the procedure followed and we ourselves observe none. And, as will next be seen, the Union here concedes that the trial court consid-

ered and determined the issue whether the Union and the employee were entitled under the Agreement to arbitration of the underlying dispute.

■ The Union's remaining and principal contention is that the superior court erred by itself determining that the employee's dispute was not arbitrable instead of submitting the issue of its arbitrability to an arbitrator.

■ The Union agrees that when one of the parties to a contract which contains an arbitration clause refuses to arbitrate on the ground that the particular dispute lies beyond the scope of that clause, the determination of the issue is *ordinarily* for the court, and not the arbitrator. (Accord Code Civ. Proc., § 1281.2; *Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 582 [4 L.Ed.2d 1409, 1417, 80 S.Ct. 1347].)

The Union and our dissenting colleague also concede that the Agreement contains *no "express* language directly supportive of the Union's position" that the parties had *agreed to arbitrate.* Instead, as our colleague has said: "The problem arises from the fact that it does not. Rather, the Union alleged in its petition that in the negotiation of the memorandum of understanding the parties 'determined to establish a system of disciplinary measures which may be taken by management including the letter of reprimand,' and that in doing so the parties 'contemplated that employees would not suffer by adverse personnel action except by the employment by management of the disciplinary procedures set forth in the Memorandum of Understanding.' *Thus, the Union seems to be contending for an obligation either expressed orally in the negotiations or implied from the negotiations, past practices, or relationship of the parties."* (Italics added.)

The Union's reliance is upon what has come to be known as the *Steelworkers Trilogy.* It consists of the nation's high court's cases: *Steelworkers v. American Mfg. Co.* (1960) 363 U.S. 564 [4 L.Ed.2d 1403, 80 S.Ct. 1343]; *Steelworkers v. Warrior & Gulf Co., supra,* 363 U.S. 574; and *Steelworkers v. Enterprise Corp.* (1960) 363 U.S. 593 [4 L.Ed.2d 1424, 80 S.Ct. 1358]. The *Steelworkers Trilogy* has effectively become a part of California law. (See *Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169 [14 Cal.Rptr. 297, 363 P.2d 313], *passim; O'Malley v. Wilshire Oil Co.* (1963) 59 Cal.2d 482 [30 Cal.Rptr. 452, 381 P.2d 188], *passim.*)

Each of the *Steelworkers Trilogy* cases concerned, *as does the case at hand,* a negotiated labor-management agreement providing for arbitration of disputes over *the interpretation or application of, or compliance with, the terms of the agreement.* It was held that arbitration of disputes under such an agreement will be judicially ordered, unless it may be said "beyond dispute," or "with positive assurance" that the contract is not "susceptible of an interpretation" that the parties had so agreed. In case of "doubt" resolution of the dispute will be ordered arbitrated (*Warrior,* 363 U.S., p. 583 [4 L.Ed.2d, p. 1418]), for both a "presumption" and "public policy" favor arbitration of labor disputes. And a collective bargaining agreement was held to be "more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... It calls into being a new common law—the common law of a particular industry or of a particular plant.... '[T]he words of the contract [are not] the exclusive source of rights and duties [in relation to arbitration].'...[¶]...Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops...." (*Warrior,* 363 U.S., pp. 578-580 [4 L.Ed.2d, pp. 1414-1416]; fns. omitted.)

However, it will be noted that the *Steelworkers Trilogy* of cases relate to collective bargaining agreements between private corporations or persons. There is much doubt that they will apply to such an agreement of a state, or of one of its principal subdivisions, such as the County.

In *Lodge 2424, Intern. Etc.* v. *United States* (Ct.Cl. 1977) 564 F.2d 66, the Lodge endeavored to enforce arbitration against the government under the broad *Steelworkers Trilogy* principles. Finding those principles inapposite, the court held (pp. 71-72): "[The *Steelworkers Trilogy*] cases cited...all concern labor arbitration awards made in the context of private labor disputes. Those decisions focus on the Congressional intent, as reflected in the Labor-Management Relations Act, 29 U.S.C. § 141, *et seq.,* 61 Stat. 136, that industrial labor disputes be settled by arbitration. However, the definition of 'employer' in the Labor-Management Act specifically excludes the United States, 29 U.S.C. §§ 142(3) and 152(2). Consequently, *those cases, which limit judicial review and accord finality to decisions of arbitrators, including their construction of provisions of collective bargaining agreements, have no application to an arbitrator's decision made pursuant to a collective bargaining agreement between the Government and a union."* (Italics added.) It is noted that the referred to definition of "employer" ex-

cludes therefrom not only the United States, but also "any State or political subdivision thereof" (29 U.S.C. § 152) such as the County.

Similarly, New York's highest court in *Supt. of Schools* v. *Liverpool* (1977) 42 N.Y.2d 509 [399 N.Y. Supp.2d 189, 369 N.E.2d 746], refused to apply *Steelworkers Trilogy* principles to the collective bargaining agreement of another public entity, a school district. The court stated (pp. 512, 513-514): "Because of the recognition that arbitration has been demonstrated to be a salutary method of resolving labor disputes, because of the public policy (principally expressed in the Federal cases) which favors arbitration as a means of resolving such disputes, and because of the associated available inference that the parties to a collective bargaining agreement probably intended to resolve their differences by arbitration, the courts have held that controversies arising between the parties to such an agreement fall within the scope of the arbitration clause unless the parties have employed language which clearly manifests an intent to exclude a particular subject matter. . . . *In the field of public employment, as distinguished from labor relations in the private sector, the public policy favoring arbitration—* of recent origin—*does not yet carry the same historical or general acceptance,* nor, as evidenced in part by some of the litigation in our court, has there so far been a similar demonstration of the efficacy of arbitration as a means for resolving controversies in governmental employment. Accordingly, *it cannot be inferred as a practical matter that the parties to collective bargaining agreements in the public sector always intend to adopt the broadest permissible arbitration clauses. Indeed, inasmuch as the responsibilities of the elected representatives of the tax-paying public are overarching and fundamentally nondelegable, it must be taken, in the absence of clear, unequivocal agreement to the contrary, that the board of education did not intend to refer differences which might arise to the arbitration forum. Such reference is not to be based on implication."* (Italics added; but contra, see *Kaleva-Norman-Dickson Sch. D.* v. *Teachers' Ass'n.* (1975) 393 Mich. 583 [227 N.W.2d 500].)

The foregoing rationale seems particularly apposite to the case at bench.

It need not be emphasized that in a government such as ours *all power is vested in the people and their chosen representatives.* (See Cal. Const., art. II, § 1.) The state's Constitution, article XI, section 1,

subdivision (b), provides that *each county's "governing body shall provide for the* number, *compensation,* tenure, and appointment *of [its] employees."* And article XI, section 11, subdivision (a), of that document states: *"The Legislature may not delegate to a private person...power to...control...or interfere with county* or municipal *[matters]* or to...perform municipal functions." (All italics of this paragraph added.) ▮ We observe there no "presumption" or "public policy" that local entities surrender their constitutionally granted function of providing for the compensation and tenure of their employees to a private person arbitrator from whose decision there is ordinarily no appeal. (See *Jones v. Kvistad* (1971) 19 Cal.App.3d 836, 842-843 [97 Cal.Rptr. 100]; *Shammas v. National Telefilm Associates* (1970) 11 Cal.App.3d 1050, 1056 [90 Cal.Rptr. 119].)

No contrary implication is found in *Taylor v. Crane* (1979) 24 Cal.3d 442 [155 Cal.Rptr. 695, 595 P.2d 129]. There a city's charter and a Meyers-Milias-Brown Act memorandum of understanding *expressly* authorized an arbitrator's binding review of the city manager's imposition of employee discipline, *and it was so conceded by the city.* In a disciplinary matter such an arbitrator reduced the penalty fixed by the city manager. The city's contention on appeal was that although the arbitrator might have determined whether the employee was guilty of the charged misconduct and subject to discipline, he was without power to modify the penalty fixed by the city manager. The high court held that *"[o]nce an arbitrator's significant participation in the disciplinary process is accepted"* by the parties, "public policy considerations" require that the arbitrator's role be not "limited," to the end that the dispute be resolved "quickly and inexpensively," and that the judicial burden be "eased." (24 Cal.3d, p. 452; italics added.) No indication is found that where a public entity, as here, has *expressly* agreed to arbitration in *one area only* of its employee relations, i.e., discipline for employee *misconduct,* "sound policy" and a "strong presumption" prefer a judicial construction that it has agreed to arbitration in *all, or other, such areas.*

▮ *Taylor* v. *Crane* thus gives effect to the established rule iterated by *Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481 [121 Cal.Rptr. 477, 535 P.2d 341], that while there is *"a strong policy in favor of enforcing agreements to arbitrate,...there is no policy compelling persons to accept arbitration of controversies which [as here] they have not agreed to arbitrate...."* (Italics added.)

An additional issue appears to be presented by the Union, which we interpret and dispose of, as follows. Despite the clear holding of *Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328, 334-335, that a Meyers-Milias-Brown Act memorandum of understanding becomes a *"binding agreement"* when approved by the public entity, the Union insists that the Agreement was more in the nature of a *"legislative act"* requiring, *as a matter of law,* that issues such as that before us be arbitrated. Reliance is placed upon *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403], an authority which we have carefully considered. Nothing is there found supportive of the argument. Treating, arguendo, the Agreement as a legislative act of the County, no requirement for arbitration of a merit salary step increase denial as a disciplinary grievance will be found therein. ■ And we are advised of no rule of law requiring arbitration under a legislative act which does not, itself, so provide.

Furthermore, constitutional, statutory, and decisional law aside, we are of the opinion that no sound public policy would be served by judicial or legislative imposition upon an *unwilling* local public entity of an arbitrator whose discretion is beyond judicial or any review.

But we conclude further, that even were the *Steelworkers Trilogy* principles applicable to the case before us, they would nevertheless be of no avail to the Union.

The *Steelworkers Trilogy* cases *additionally* provide:

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.... [T]he judicial inquiry...must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award...." (*Warrior,* 363 U.S., p. 582 [4 L.Ed.2d, p. 1417].) The arbitrator's power "is legitimate only so long as it draws its essence from the collective bargaining agreement." (*Enterprise,* 363 U.S., p. 597 [4 L.Ed.2d, p. 1428].) And arbitration will be ordered only when "the party seeking arbitration is making a claim which on its face is governed by the contract." (*American,* 363 U.S., p. 568 [4 L.Ed.2d, p. 1407].)

California law is completely in accord.

The right to compel arbitration depends upon "the existence of a written agreement to arbitrate a controversy," and a court may order arbitration *only* "if it determines that an agreement to arbitrate the controversy exists,..." (Code Civ. Proc., § 1281.2.)

"There is indeed a strong policy in favor of enforcing agreements to arbitrate, *but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate....*" (*Freeman* v. *State Farm Mut. Auto. Ins. Co., supra,* 14 Cal.3d 473, 481, italics added; *Delta Lines, Inc.* v. *International Brotherhood of Teamsters* (1977) 66 Cal.App.3d 960, 966 [136 Cal.Rptr. 345].)

"Arbitration is a matter of contract and a party cannot be required to arbitrate a dispute he has not agreed to submit." (*Pacific Inv. Co.* v. *Townsend* (1976) 58 Cal.App.3d 1, 9 [129 Cal.Rptr. 489]; *Unimart* v. *Superior Court* (1969) 1 Cal.App.3d 1039, 1045 [82 Cal.Rptr. 249].) And, "it is the role of the court to determine whether a party resisting arbitration has agreed to arbitrate." (*Vernon* v. *Drexel Burnham & Co.* (1975) 52 Cal.App.3d 706, 713 [125 Cal.Rptr. 147].)

■ "'[T]he function of a court in deciding whether a dispute is subject to arbitration "is confined to ascertaining whether the party seeking arbitration *is making a claim which on its face is governed by the contract."'"* (*Charles J. Rounds Co.* v. *Joint Council of Teamsters No. 42* (1971) 4 Cal.3d 888, 892 [95 Cal.Rptr. 53, 484 P.2d 1397]; *Butchers' Union Local 229* v. *Cudahy Packing Co.* (1967) 66 Cal.2d 925, 931 [59 Cal.Rptr. 713, 428 P.2d 849].)

From our foregoing discussion of the *Steelworkers Trilogy* holdings it appears that in doubtful cases a duty to arbitrate will be judicially decreed. But there will be no arbitration unless a contract therefor expressly so provides. And the contract will consist of the written agreement of the parties, as modified by such otherwise legally admissible extrinsic evidence, if any, as may be allowed in aid of its interpretation. Such extrinsic evidence may include such "common law" or "practices" or other matters as may be available to "fill in gaps" or throw light upon the intent of the parties to arbitrate the dispute at issue.

■ As we have pointed out, it is conceded that the Agreement did not *expressly* authorize arbitration of the employee's dispute. Extrinsic

evidence admitted in the superior court established no further oral, or collateral agreement. Nor did it establish custom, or practice, or "common law," of the parties' relationship "filling in the gaps," thus indicating an intent to arbitrate. In other words, there was nothing before the court which directly, or impliedly, or inferentially, established or tended to establish, the existence of an agreement to arbitrate the subject grievance.

It was therefore without "doubt," and "beyond dispute," that the Agreement was *not* "susceptible of an interpretation" that the parties had agreed to arbitrate the employee's dispute.

Certain authoritative holdings here bear emphasis. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (*Warrior,* 363 U.S., p. 582 [4 L.Ed.2d, p. 1417].) "[T]here is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate. . . ." (*Freeman* v. *State Farm Mut. Auto. Ins. Co., supra,* 14 Cal.3d 473, 481.)

The judgment is affirmed.

Newsom, J., concurred.

**GRODIN, J.**—I respectfully dissent. The majority's conclusion is bottomed on two alternative propositions: (1) that principles ordinarily applicable to determining arbitrability of disputes in California may for some reason be inapplicable to disputes in the public sector; and (2) that even if applicable those principles do not require arbitration of this particular dispute. I believe both propositions are wrong.

I

It is of course true that arbitration is ordinarily a matter of agreement between the parties (cf. so-called "Judicial Arbitration," Code Civ. Proc., § 1141.10 et seq.) and that when one of the parties to an agreement which contains an arbitration clause refuses to arbitrate on the ground that the particular dispute lies outside the scope of that clause, the determination of that issue is ordinarily for the court. The rule is otherwise where the parties have expressly provided that the arbitrator is to determine issues of arbitrability as well (cf. *Steelworkers*

v. *Warrior & Gulf Co.* (1960) 363 U.S. 574, 583, fn. 7 [4 L.Ed.2d 1409, 1418, 80 S.Ct. 1347]), but no such provision appears here. Accordingly, it was entirely appropriate for the trial court to undertake preliminary determination as to arbitrability.[1] The question is what standards govern that determination.

When a court is called upon to consider a claim of nonarbitrability, two principles apply. The first of these is found in the California Arbitration Act itself.[2] Code of Civil Procedure section 1281.2 provides that in a proceeding to compel arbitration, once a court finds that an agreement to arbitrate exists, "an order to arbitrate...may not be refused on the ground that the petitioner's contentions lack substantive merit." The legislative history underlying this provision makes clear that its purpose was to eliminate from California law the so-called *Cutler-Hammer* doctrine (after a decision by the New York courts in *International Ass'n of Machinists* v. *Cutler-Hammer* (1947) 271 App.Div. 917 [67 N.Y.S.2d 317] (affd., 297 N.Y. 519 [74 N.E.2d 464]), to the effect that arbitration should be denied if the meaning of the provision sought to be arbitrated is "beyond dispute." That doctrine, as the California Law Revision Commission observed in the report which formed the basis of the current statute, would "permit the courts to resolve the very questions that the parties have agreed to submit to the decision of the arbitrators." (Law Revision Commission's Recommendation and Study Relating to Arbitration (Dec. 1960) p. G6.) It would, moreover, provide an incentive to delay. (*Id.*, at pp. G37-G38.)

---

[1] While the Union in its brief does appear at one point to argue to the contrary, I do not believe it is accurate to characterize this argument as the Union's "remaining and principal contention." The major thrust of the Union's argument is that the trial court incorrectly determined the arbitrability issue.

[2] As the majority notes, a memorandum of understanding entered into pursuant to the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) and approved by the governing body of the public entity constitutes a binding agreement under *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328 [124 Cal.Rptr. 513, 540 P.2d 609], (cert. den. 424 U.S. 943 [47 L.Ed.2d 349, 96 S.Ct. 1411]), and therefore fits comfortably within the definition of "agreement" contained in the California Arbitration Act (Code Civ. Proc., § 1280, subd. (a)): "'Agreement' includes...agreements between employers and employees or between their respective representatives." Thus, it seems quite clear that the Arbitration Act applies, and I read the majority opinion as being in accord with this proposition.

The majority concludes, and I agree, that while a petition to compel arbitration under the statute would have been the more appropriate procedure, the fact that the Union sought a writ of mandate should not preclude consideration of the merits. The procedure that was followed was virtually the same as that which would have been called for under the statute, and as the majority notes there is no showing of prejudice. (Cf. *Robinson* v. *Superior Court* (1950) 35 Cal.2d 379, 383 [218 P.2d 10]; *Neal* v.

The second principle applicable to the judicial role in cases such as this is that there exists a strong presumption in favor of arbitrability, to the effect that an order to arbitrate should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage [and in] the absence of any express provision excluding a particular grievance from arbitration...only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail...." The quoted language is from an opinion of the United States Supreme Court in *Steelworkers* v. *Warrior & Gulf Co., supra,* 363 U.S. at pages 582-585 [4 L.Ed.2d at pp. 1417-1419], one of three companion cases involving labor arbitration and known collectively as the *Steelworkers Trilogy.* Though state courts are not obligated to apply federal principles to agreements not covered by federal law (cf. *Teamsters Local* v. *Lucas Flour Co.* (1962) 369 U.S. 95 [7 L.Ed.2d 593, 82 S.Ct. 571]), the principles announced in the trilogy cases have in effect been absorbed into California law (*Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169 [14 Cal.Rptr. 297, 363 P.2d 313]; *O'Malley* v. *Wilshire Oil Co.* (1963) 59 Cal.2d 482, 490-491 [30 Cal.Rptr. 452, 381 P.2d 188]). Indeed, while the United States Supreme Court in the trilogy cases based its opinions in part upon the unique characteristics of collective bargaining agreements, California courts have applied trilogy principles more generally to commercial arbitration as well.[3] The state's Supreme Court, for example, in *Morris* v. *Zuckerman* (1968) 69 Cal.2d 686, 690 [72 Cal.Rptr. 880, 446 P.2d 1000], cited *O'Malley* v. *Wilshire Oil Co., supra,* 59 Cal.2d 482, for the proposition that "any doubts as to the meaning or extent of an arbitration agreement are for the arbitrators and not the court to resolve," and it has been observed that *Morris* "appears to have eliminated any distinction in the degree of strictness with which arbitration agreements in commercial contracts should be construed as against those in collective bargaining agreements." (*Lesser Towers, Inc.* v. *Roscoe-Ajax Constr. Co.* (1969) 271 Cal.App.2d 675, 696 [77 Cal.Rptr. 100].) The

---

*State of California* (1960) 55 Cal.2d 11, 16 [9 Cal.Rptr. 607, 357 P.2d 839].) It is not entirely clear whether my colleagues consider the substantive law of the arbitration statute applicable to the merits. In my judgment, it is applicable on the ground that the proceeding should be treated as if it had been instituted under the statute.

[3]The court in *Posner* did not confine itself to discussion of labor arbitration and in *Swift-Chaplin Productions, Inc.* v. *Love* (1963) 219 Cal.App.2d 110, 115 [32 Cal.Rptr. 758, 5 A.L.R.3d 1001], the court observed: "While the facts of, and the policies underlying the *Posner* and *O'Malley* decisions and the federal cases upon which they rely, would make it possible to limit the application of the rules established in *Posner* to collective bargaining cases, the court apparently did not desire to do so ...."

"positive assurance" test for determining arbitrability seems thus firmly embedded in California law. (See, in addition to *Morris* v. *Zuckerman, supra,* 69 Cal.2d 686, *Cook* v. *Superior Court* (1966) 240 Cal.App.2d 880, 886 [50 Cal.Rptr. 81] [citing *O'Malley* for the proposition that """"Doubts as to whether the arbitration clause applies are to be resolved in favor of coverage"""]; *East San Bernardino County Water Dist.* v. *City of San Bernardino* (1973) 33 Cal.App.3d 942, 953 [109 Cal.Rptr. 510] ["in the absence of an express provision removing a particular issue from arbitration...only a clear-cut expression to exclude a claim from arbitration can prevail"]; *Lewsadder* v. *Mitchum, Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255, 259 [111 Cal.Rptr. 405] ["every intendment will be indulged to give effect to such proceedings"]; *Lesser Towers, Inc.* v. *Roscoe-Ajax Constr. Co., supra,* 271 Cal.App.2d at p. 695 ["If there is any doubt as to whether an arbitration provision in an agreement covers a given controversy, it should be resolved in favor of coverage"].)

My colleagues concede that the trilogy presumption "has effectively become a part of California law," but they suggest that there is "much doubt" as to whether its principles are applicable to agreements in the public sector. I would have thought that any doubt on that question was removed by the Supreme Court's decision in *Taylor* v. *Crane* (1979) 24 Cal.3d 442 [155 Cal.Rptr. 695, 595 P.2d 129], in which the city argued that the arbitrator exceeded his authority by deciding issues beyond the scope of the arbitration clause,[4] and the court responded as follows: "As a rule, courts defer to arbitrators in determining the extent and meaning of arbitration agreements. (*Morris* v. *Zuckerman* (1968) 69 Cal.2d 686, 690....) Although an award may be vacated if the arbitrator has exceeded his powers (Code Civ. Proc., § 1286.2), *ambiguities in the scope of arbitration are resolved in favor of coverage. (Morris* v. *Zuckerman, supra,* 69 Cal.2d at p. 690; *East San Bernardino County Water Dist.* v. *City of San Bernardino* (1973) 33 Cal.App.3d 942, 953....)" (*Id.,* at p. 450, italics added.) The underlined language, together with the authorities cited in its support, makes clear in my mind that the presumption of arbitrability applicable generally to arbitration in California is applicable in the public sector as well.

---

[4]It is somewhat misleading to say that the agreement *"expressly"* authorized an arbitrator's binding review of employee discipline, and that *"it was so conceded by the city."* The city conceded that the arbitrator had authority to decide whether the employee violated applicable regulations, but argued he did not have authority to decide whether discipline was proper if the employee did commit such a violation. (*Taylor* v. *Crane, supra,* 24 Cal.3d at p. 450.)

Indeed, since California applies the same presumption of arbitrability to all arbitration agreements, refusal to apply that presumption to public sector labor arbitration would be anomalous. While the trilogy cases sought to distinguish collective bargaining agreements from commercial agreements in order to isolate the hostility which some courts displayed toward commercial arbitration, that hostility is entirely antithetical to the affirmative approach which California courts have displayed toward arbitration in general. (E.g., *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 706 [131 Cal.Rptr. 882, 552 P.2d 1178].) What is involved is not simply a public policy favoring arbitration, since parties are ordinarily free to decide whether or not they wish to arbitrate, but rather a policy designed to assure the parties the benefit of their bargain. To the extent that a party can avoid or delay arbitration through judicial procedures, the value of arbitration may be lost.

In any event, the distinctive features of the collective bargaining agreement which arguably warrant special judicial restraint in determining arbitrability are for the most part present in the public sector as in the private. The state Supreme Court, following the lead of the United States Supreme Court, has recognized the "unique nature of the collective bargaining contract and . . . the vital and dynamic role of the arbitrator in the area of industrial relations." (*O'Malley* v. *Wilshire Oil Co., supra,* 59 Cal.2d at p. 490.) The labor agreement involves not a single transaction but a continuing, complex, multi-faceted relationship in which not all problems can be anticipated in advance. It is, in a sense, "more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . [It] covers the whole employment relationship. It calls into being a new common law—the common law of the particular industry or of a particular plant." (*Steelworkers* v. *Warrior & Gulf Co., supra,* 363 U.S. at pp. 578-579 [4 L.Ed.2d at p. 1415]; see *Posner* v. *Grunwald-Marx, Inc., supra,* 56 Cal.2d at pp. 176-178.) The labor agreement "requires arbitration of claims that courts might be unwilling to entertain." (*Steelworkers* v. *American Mfg. Co.* (1960) 363 U.S. 564, 567 [4 L.Ed.2d 1403, 1406, 80 S.Ct. 1343]; *Posner* v. *Grunwald-Marx, Inc., supra,* at p. 176.) Where, as here, arbitration is over a matter that would be cognizable in court it "eases the burdens on courts while resolving disputes quickly and inexpensively." (*Taylor* v. *Crane, supra,* 24 Cal.3d at p. 452.) And, of course, labor arbitrators are typically selected by the parties on the basis of a background of knowledge and experience in labor relations that judges, by and large, do not possess.

Thus, "[w]hile all of the premises stated in the trilogy cases for judicial deferral may not be present in the public sector, certain crucial premises are: that effective labor relations requires a dynamic view of the collective agreement as establishing a process for resolution of a wide range of disputes, and that arbitration can be an effective method for resolving disputes quickly, peacefully, and in a manner most likely to be in accord with the ongoing relationship of the parties." (Aaron, et al., Public-Sector Bargaining (1979) Judicial Response to Public-Sector Arbitration, p. 251.)

The fact that all governmental power is vested in the people and their chosen representatives seems to me, with all respect, to be completely beside the point. There is no question of intrusion upon governmental sovereignty involved in arbitration of a grievance arising out of an existing agreement. As the Supreme Court stated in *Taylor* v. *Crane,* "It has long been recognized that a city may agree to arbitrate any matter which could be the subject of civil suit." (24 Cal.3d at p. 451.)[5]

The applicability of trilogy principles to the public sector has been recognized by nearly all state courts which have considered the question.[6] The aberrant decision of the New York Court of Appeal in *Supt. of Schools, Liverpool* (1977) 42 N.Y.S.2d 509 [399 N.Y.2d 189, 369 N.E.2d 746], must be viewed against the background of a legal schism which exists in that state between commercial and labor arbitration—a schism foreign to California law, as discussed *ante*—and in light of subsequent opinions which appear to have eroded *Liverpool's* nominal rejection of the trilogy presumption (e.g., *South Colonie School* v. *Longo* (1977) 43 N.Y.2d 136 [400 N.Y.S.2d 798, 371 N.E.2d 516]). Federal policy is now reflected in the Civil Service Reform Act of 1978, 5 United States Code section 7101 et seq., which exceeds private sector deference to arbitrators in arbitrability matters by requiring that the

---

[5]I take it there is no question but that, in the absence of an arbitration clause, the Union could have filed an action contending that the County's conduct violated the agreement, and that the court would have had jurisdiction over the action under *Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328. Whether the Union would have had any chance to succeed is, of course, a different question.

[6]E.g., *Board of Ed of Town of Greenwich* v. *Frey* (1978) 174 Conn. 578 [392 A.2d 466, 468]; *Pittsburgh, etc.* v. *City of Pittsburgh* (1978) 481 Pa. 66 [391 A.2d 1318, 1320-1321; *School Committee, etc.* v. *Pawtucket, etc.* (1978) — R.I. — [390 A.2d 386, 389-390]; *School Committee of Danvers* v. *Tyman* (1977) 372 Mass. 106 [360 N.E.2d 877, 881]; *Kaleva-Norman-Dickson Sch. D. of Manistee, etc.* v. *Kaleva-Norman-Dickson School Teachers' Ass'n* (1975) 393 Mich. 583 [227 N.W.2d 500, 504].

agreement itself contain procedures for resolving such questions (5 U.S.C.A. § 7121(a)(1)). Arbitral awards are subject to review "on ...grounds similar to those applied by Federal courts in private sector labor-management relations." (5 U.S.C.A. § 7122(a)(2).) *Lodge 2424, Intern. etc.* v. *United States* (Ct. Cl. 1977) 564 F.2d 66, upon which the majority relies, involved review of an arbitrator's award rather than an issue of arbitrability. The court quite properly observed that trilogy principles were not legally binding under the federal executive order which existed at the time, but even so the observation was unnecessary since the principles of review which the court brought to bear were perfectly compatible with trilogy principles. In any event, in light of the Civil Service Reform Act, the decision is no longer relevant precedent. It is fair to say that the position suggested by the majority is contrary both to relevant authority in California and to the great weight of current authority throughout the nation.

## II

The issue which the Union seeks to arbitrate, as the majority notes, is whether the memorandum of understanding requires the County to undertake some formal disciplinary action, such as a letter of reprimand, *before* it denies an employee a step increase on the basis of unsatisfactory performance. Section 7.1 of the memorandum of understanding provides for arbitration of grievances which "involve a disagreement over the interpretation, application, or compliance with the terms of the Memorandum of Understanding; *or* involve a disciplinary action or a discharge of a permanent employee." (Italics added.) Thus, arbitrability of the issue is not precluded, as the trial court apparently thought, by a determination that a step increase does not constitute "disciplinary action." Nor, contrary to the opinion of my colleagues, is this a situation where the parties have agreed to arbitration "in *one area only*" of employee relations. The agreement contains no language excluding any particular matters from the scope of arbitration. Thus, arbitrability turns upon whether the Union's claim presents a "disagreement over the interpretation, application, or compliance with the terms of the Memorandum of Understanding."

More precisely, in view of the above-stated principles, the question is whether the quoted language is "susceptible of an interpretation" as embracing that issue, or whether, on the other hand, it can be stated with "positive assurance," and without intrusion upon the merits, that the parties did not intend to arbitrate such a dispute.

The answer to that question would itself be beyond dispute if the agreement contained any *express* language directly supportive of the Union's position. The problem arises from the fact that it does not. Rather, the Union alleged in its petition that in the negotiation of the memorandum of understanding the parties "determined to establish a system of disciplinary measures which may be taken by management including the letter of reprimand," and that in doing so the parties "contemplated that employees would not suffer by adverse personnel action except by the employment by management of the disciplinary procedures set forth in the Memorandum of Understanding." Thus, the Union seems to be contending for an obligation either expressed orally in the negotiations or implied from the negotiations, past practices, or relationship of the parties.

Whether or not the Union would have any chance of succeeding before an arbitrator on this contention is, contrary to the suggestion of my colleagues, not an issue before us. Nor is it our function now to speculate whether an award accepting that contention would be enforceable. (Cf. *Taylor* v. *Crane, supra,* 24 Cal.3d at p. 450.) The only question is whether that contention raises a disagreement concerning "interpretation, application, or compliance." I am of the opinion that it does.

Unless the parties otherwise agree (and this agreement contains no exclusionary language) the absence of an express provision supportive of a claim does not bar arbitrability any more than it would bar litigation in the absence of an arbitration clause. The implication of terms based on past practice or the relationship of the parties is a commonplace in contract law. (3 Corbin on Contracts (1951) § 561 et seq.) Its function in the context of a collective bargaining agreement is of even greater significance, since such an agreement is "more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." (*Steelworkers* v. *Warrior & Gulf Co., supra,* 363 U.S. at p. 578 [4 L.Ed.2d at p. 1415].) Thus, the United States Supreme Court stated in *Steelworkers* v. *American Mfg. Co., supra,* 363 U.S. at page 568 [4 L.Ed.2d at p. 1407]: "The courts...have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, *or determining whether there is particular language in the written instrument which will support the claim.*" (Italics added.) And in *Warrior & Gulf, supra,* where the union sought arbitration of a grievance involving subcontracting of work in the face of a contract silent on that subject, the court concluded in the penulti-

mate paragraph of its decision: "The grievance alleged that the contracting out was a violation of the collective bargaining agreement. *There was, therefore, a dispute 'as to the meaning and application of the provisions of this Agreement' which the parties had agreed would be determined by arbitration.*" (363 U.S. at p. 585 [4 L.Ed.2d at p. 1419], italics added.) Applying these principles, the Court of Appeals for the Ninth Circuit has reasoned that "explicit language in collective bargaining agreements covering each specific claim alleged to be arbitrable is not required. . . . [T]he complete silence of an agreement on the issues sought to be arbitrated is not sufficient evidence to meet the rigorous standard set by the *Steelworkers Trilogy* for a finding of non-arbitrability. [Citations.]" (*International Ass'n of Machinists* v. *Howmet Corp.* (9th Cir. 1972) 466 F.2d 1249, 1252.) Here, as in *Warrior & Gulf,* the Union has alleged that particular conduct on the part of the employer was a violation of the agreement. There was, therefore, a disagreement over the interpretation, application, or compliance with the terms of the memorandum of understanding, and that disagreement should have gone to arbitration. I would reverse.

Appellant's petition for a hearing by the Supreme Court was denied March 13, 1980. Bird, C. J., Tobriner, J., and Newman, J. were of the opinion that the petition should be granted.